## Main *et al.* versus Ryder *et al.*
## Same *versus* Miner *et al.*

1. Under the Act of the 27th January 1848, the execution of a will is valid where the testator affixes his mark thereto, although able to write his name.

2. It seems, however, that although the testator's name should be written to a will at his request and in his presence, and with the intent that he should affix his mark thereto, the execution will not be valid if he failed to so affix it.

3. Where the testator lived with a woman to whom he was not legally married, and she and her offspring were the devisees of a large portion of his property, these circumstances do not create a presumption that the will was executed under improper influences, and while this illicit relation should be considered in determining the question of undue influence, the effect of such testimony is a question of fact for a jury.

March 29th 1877. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON, WOODWARD and STERRETT, JJ.

Error to the Court of Common Pleas of *Wayne county :* Of July Term 1876, Nos. 49 and 50.

These were two actions of ejectment for two farms, one brought by Daniel D. Main and others, against Rachael Ryder and James, Emily and Caroline Miner, and the other by the same plaintiffs against Horace and Henry Miner and Catharine Hooker.

The plaintiffs claimed as the legal heirs of Daniel Miner, deceased, and the defendants as devisees under his will. In 1825, Daniel Miner Main married Phœbe Dennison in the state of New York,

[Main *v.* Ryder.]

with whom he had several children, born in lawful wedlock, and who are the plaintiffs in this suit. About thirteen years thereafter, said Main left his wife and children in New York and came to Wayne county, under the name of Daniel Miner, in company with a woman named Catharine Hooker, with whom he lived, cohabited and had children. Three of these children are defendants in these suits, James A. Miner being a defendant in one and Horace and Henry Miner in the other. Four years after his coming to Wayne county, Daniel Miner commenced to live and cohabit with Rachael Ryder, and continued to live with her until the day of his death, twenty-six years thereafter. By her he had several children, two of whom, Emily and Caroline Miner, are joined as defendants in the suit against James A. Miner, in which also Rachael Ryder is a defendant. Catharine Hooker was joined as a defendant in the suit against Horace and Henry, because of her being in possession of one of the farms. Daniel Miner was never married to either Catharine Hooker or Rachael Ryder. At the time of his death, he lived on a farm with Rachael Ryder and her two daughters. Catharine Hooker, with her two sons, Horace and Henry, resided on another farm. These two farms are the subjects of controversy in these suits. It was admitted that these properties were owned by Daniel Miner at the time of his death.

At the trial, before Dreher, P. J. (of the 43d judicial district), the plaintiffs proved the marriage, in 1825, of Daniel Miner Main with Phœbe Dennison; that they had lived together some thirteen years in New York state, and had seven children; that said Main had abandoned his wife and children and came to Wayne county with Catharine Hooker, with whom he lived under the name of Daniel Miner, and that his first wife, Phœbe, died in 1869.

The plaintiffs, who were his children by this first marriage, claimed the farms as his heirs at law. The defendants claimed under a will of Daniel Miner, who died on 4th of January 1873. The will was dated the 26th of December 1872, and was proved the 15th day of January 1873.

This will contained the following provisions affecting the parties herein concerned:—

" I give and bequeath to my wife, Rachael Ryder, the use of my farm, on which I now live, as long as she shall live.

" 2. I will that my two children, Emily Ellen and Caroline Louisa, have a living on my said farm with Rachael Ryder, till they arrive at the full age of twenty-one years.

" 3. I will my son, James A. Miner, shall work the farm on which I now live, and keep my wife and two children above named.

" 4. I will to Horace and Henry the farm on which they now live, to share alike in the same.

* * * "James A. Miner to move on the farm where I now live

[Main *v.* Ryder.]

and take care of the stock and pay the heirs as above stated, and keep my wife, Rachael Ryder, and the children as aforesaid. And after the death of the said Rachael, and upon the two girls becoming twenty-one years of age, the farm to be the property of James A. Miner.

"I further will that my daughter, Emily Ellen Miner, shall have her support out of my estate as aforesaid, as willed to James A. Miner, so long as she shall live. * * *"

And was signed and attested as follows:—

"In witness whereof, I, Daniel Miner, the testator, have to this, my will, written on one sheet of legal cap paper, set my hand and seal this the twenty-sixth day of December, in the year of our Lord, one thousand eight hundred and seventy-two.

Signed, sealed, published and declared by the above named Daniel Miner, as and for his last will and testament, in the presence of us who have hereunto subscribed our names at his request as witnesses, that, in the presence of the said testator and of each other.

"ORSON CASE,

"J. W. STANTON.

his<br>
DANIEL + MINER (SEAL).<br>
mark<br>
Witness his mark—M. M. THORPE."

It was admitted that the defendants were the devisees under the will of Daniel Miller.

In rebuttal, the plaintiffs called Stanton, one of the subscribing witnesses, who said: * * * "There was something said about Mr. Miner signing; Mr. Thorpe asked him if he could sign it; he said he had wrote his name, but he did not know whether he could then or not; Mr. Case then said if he made his mark it would do just as well; Mr. Thorpe, I think, said yes; then Mr. Miner took hold of the pen and Mr. Thorpe made the mark; Miner took hold of the top of the pen." * * *

Case testified: "Am one of subscribing witnesses to Daniel Miner's will; * * * think something was said about Mr. Miner's signing the will; Mr. Miner said he had wrote his name and didn't know but he could again; I spoke and said it looked hard for a man that was as sore as he was and as sick as he was, to get up; I suggested that Mr. Thorpe write his name and let Mr. Miner touch the tip of the pen, and make his mark; Mr. Thorpe said it would do just as well; Mr. Miner at this time was making an effort to turn over and was almost on his left side, as if he was going to write, and I think he would have done it; I think he could and would have written his name; Miner said Mose should write his name; I don't know exactly what Miner did say; it is my im-

[Main *v.* Ryder.]

pression and am quite positive he told Mose to write his name.
The substance was for Mose to write it; I can't remember the
words; after Thorpe had written the name, he held the paper
up on a book or something, pretty near edge of bed; Miner par-
tially turned up and took hold of pen and made his mark; Mr.
Thorpe I suppose made the mark, Mr. Miner had hold of the top
of the pen. * * *

"At the time Thorpe said it would do just as well, when I sug-
gested Miner could touch the pen and make the mark, I don't
remember just the reply Miner made, but he consented to make
his mark—that Thorpe should write his name and he would touch
the pen."

James A. Miner testified : " Father requested Thorpe to write
his name and he would make his mark; he said he did not feel
able to get up and write his name and suggested Thorpe should
make his mark; Thorpe wrote his name; father raised his head
up, resting on his elbow, and he took hold of the pen; I can't say
whether he made the mark or Thorpe."

Thorpe testified : * * * "Miner could write his name; * * *
I asked him to sign his name; he was lying in bed; I moved
around from the back side of the table, took a pen and this sheet
and handed it to him to sign; he said, 'You sign it;' Case or
Stanton said, 'yes, he can make his mark just as well;' I signed

his name to this instrument; I signed Daniel $\overset{\text{his}}{\underset{\text{mark}}{}}$ Miner; there is a

space between Daniel and Miner; it was in the ordinary form for
a person to make his mark; whether he held the pen and made
the mark or I held the pen and he touched it to make the mark, I
cannot now say; when I wrote this name as I did, it was not in-
tended as the execution of the will, but I wrote the name in that
manner for the purpose or with the intention of having Miner make
his mark; * * * Miner was quite sick; didn't have much to say
until spoken to; the provision for Emily was suggested to him;
when I read the will to him I think he made no reply unless to say
it was right, and I cannot say as to that either; * * * when I
told him I had come to draw his will he began to cry; don't know
whether he expected me or not; the names of various parties in the
will were suggested to him; * * * Miner could transact business,
but not as clearly as if not sick; naturally he was shrewd and sharp,
but not educated."

Rachael Ryder testified that she had lived with Miner for twenty-
six years; Dan was crying most of the time (during preparation
of will); he would turn his face toward the wall; sometimes he
would seem not to notice what was going on, and sometimes would
look around; Thorpe would ask, " Shall I put it down so and so ?"

[Main *v.* Ryder.]

and testator would say, "Yes;" before his death he said there was somebody in his room to kill him.

Robert Miner, a son of Rachael, testified that his father, during his sickness, talked incoherently about the cattle, which he imagined were bellowing to be fed, and about the will; that he used such expressions as "Oh, Rob, that will; Jim brought Mose down and made a will, and I don't know anything about it;" "They haven't got it right, I know." Witness did not think his father able to do any kind of business on the day he made the will.

The wife of Robert Miner testified that she did not think the testator "had his right mind when he made his will."

Dr. Niles testified: "Miner was quite sick; his mental condition was all right; when I left him on morning of 26th, was capable of transacting business; no appearance of impairment of his mental faculties; when I spoke of his having made a will, Miner said, "You know the law wouldn't fix it right in my case; I think I have fixed it right."

Rachael Ryder and her two daughters and James A. Miner were present when the will was drawn.

The plaintiffs asked the court to charge:—

That the Act of 27th January 1848, providing that a will may be executed by the mark of the testator, was intended to apply to cases where the testator is by reason of want of education unable to write his name, and does not excuse the absence of the signature of a testator who has learned to write.

The court refused and in their general charge said:—

"If Thorpe wrote Daniel Miner's name to the will, in Miner's presence and by his express direction, and Miner made the attempt to make his mark, but failed to complete the mark, or to make it in the manner required by the statute, still the will is sufficiently executed, if these facts are proved by two witnesses who were present at the time, although Miner when he directed his name to be signed intended to make his mark also, and Thorpe, when he wrote the name, intended that Miner should make his mark."

The plaintiffs also submitted the following points:—

1. If the jury believe from the evidence that at the time of the execution of the will of Daniel Miner (Main) the testator had not a full and intelligent knowledge and understanding of the act in which he was engaged, of the property he possessed, an intelligent perception of the disposition he desired to make of such property, and the persons he desired should be his beneficiaries, then the testator did not possess a disposing mind and memory, and the will is invalid and the verdict must be for the plaintiff.

The court answered:—

"Affirmed, with this explanation: That if a testator understands in detail all he is about, it is quite sufficient to sustain his will. It is not necessary at the time that he should have a recollection of all

[Main *v.* Ryder.]

his estate, his family relations in life, their condition in general, and the probable effect the proposed disposition will have, and to collect all this in one view."

2. If the jury believe from the evidence that Daniel Miner (Main) had for a long period of time been living in unlawful intercourse with Rachael Ryder and Catharine Hooker, that the will was made in the presence of said Rachael and of the children of such unlawful intercourse, and that such will is made for the benefit of the parties to or issue of such unlawful intercourse, the law présumes the exercise of an influence upon the mind of the testator, which is unlawful and therefore undue. And if the testator was at the time suffering from weakness of body or mind by reason of his last sickness, the presumption of law is against the validity of the will.

Which the court negatived.

In their general charge the court said:—

" Undue influence to destroy a will must be such that the mind and will of some one else are substituted for the will of the testator, so that the testator in his will does not express his own free will and wishes."

In both cases the verdict was for the defendants, and the plaintiffs took this writ, assigning for error the answers of the court to the foregoing points and the portion of the charge noted.

*H. M. Seely,* for plaintiffs in error.—Under the Act of 8th April 1833, Pamph. L. 249, it was held that a will could not be executed by a mark, nor could the name be signed by any other than the testator, except in the extremity of last sickness. An illiterate man, therefore, could only execute his will when upon his death-bed: Asay *v.* Hoover, 5 Barr 33. It was to relieve this difficulty that the Act of 1848 was passed (Long *v.* Zook, 1 Harris 404), and it should be limited in its construction to the case it was intended to relieve.

The court substantially instructed the jury that a name written at the bottom of a will at the request of the testator, was a good execution, although such name was intended at the time not as the act of execution, but simply as a preparation for the execution by the act of the testator making his mark.

The evidence shows that Thorpe not Daniel Miner made the mark.

From the unlawful relations of these parties and the other circumstances undue influence was to be presumed: Dean *v.* Negley, 5 Wright 317; Rudy *v.* Ulrich, 19 P. F. Smith 181.

The ruling of the court as to the undue influence necessary to destroy a will is opposed to the doctrine in Tawney *v.* Long, 26 P. F. Smith 115..

*G. G. Waller* and *E. O. Hamlin,* for defendants in error.—The Act of 1848 is a remedial statute and the construction given it by plaintiff in error is too narrow.

[Main v. Ryder.]

The will was executed by the mark of testator. He had hold of the pen and the assistance afforded him was allowable: Vandruff *et al. v.* Rinehart, 5 Casey 232; Cozzens's Will, 11 P. F. Smith 196.

Dean.*v.* Negley and Rudy *v.* Ulrich do not sustain the contention of the plaintiff in error.

That is undue influence which amounts to constraint, which substitutes the will of another for that of the testator: Eckert *v.* Flowry, 7 Wright 51; McMahon *v.* Ryan, 8 Harris 329; Thompson *v.* Kyner, 15 P. F. Smith 369; Tawney *v.* Long, 26 Id. 106.

Mr. Justice MERCUR delivered the opinion of the court, May 7th 1877.

These two cases were argued together. They involve the same question. The contention relates to the will of Daniel Miner. All the assignments of error present substantially these questions, involving its validity:—

1. The manner of its execution.
2. The mental capacity of the testator.
3. The influences under which it was executed.

We will first consider the manner of its execution. Under the Act of 1833, it was held that a will signed by the testator putting his mark to it, was not properly executed. To cure this ruling, which was questioned in Vernon *v.* Kirk, 6 Casey 218, the Act of 27th January 1848, Pamph. L. 16, was passed. It declares that every last will and testament "to which the testator hath made his mark or cross, shall be deemed and taken to be valid in all respects, provided the other requisites under existing laws are complied with."

The will of Daniel Miner bears date the 26th December 1872. It appears to have been executed by the testator making his mark or cross at the end thereof. It has two subscribing witnesses, and is wholly regular on its face.

It is contended that the Act of 1848 applies only to cases where the testator is unable to write his name by reason of want of education, and does not excuse the absence of the signature of one who is able to write. We discover nothing in the act sustaining that view. It makes no mention of insufficient education or of physical inability. It declares that form of execution as sufficient in all cases. The manifest object of the act is to permit a will to be signed as any other written instrument may be signed. Hence in Vandruff *et al. v.* Rinehart, 5 Casey 232, it was held that if one is unable from palsy or other cause, to make his signature or mark to his will, another person may steady his hand and aid him in so doing. If so done by the assistance of another it is the testator's own act. So in Cozzens's Will, 11 P. F. Smith 196, the testator was paralyzed, and said he was unable to write, but would put his mark to the

[Main *v.* Ryder.]

will. He was raised in bed; a pen was put into his hand, which was held by another while he made his mark. This was held to be a valid execution of the will.

In the case we are now considering, it appears by the evidence of Thorpe, who drew the will, that he handed it to the testator, who was lying in bed, to sign. The latter said, " You sign it." Case or Stanton said, " Yes, he can make his mark just as well." Case and Stanton each testified substantially corroborating Thorpe, and added that Miner made the further remark that he had written his name, but did not know as he could do it then, or did not know but he could do it again. Thereupon Thorpe wrote Miner's name, not in a manner indicating that it was to stand as Miner's fully executed signature, but preparatory only to his making his mark. Thorpe

wrote it " Daniel $\overset{\text{his}}{\underset{\text{mark}}{}}$ Miner."

In that portion of the charge covered by the eighth assignment the court said, " we therefore charge you that if Thorpe wrote Daniel Miner's name to the will in Miner's presence and by his express directions, and Miner made the attempt to make his mark, but failed to complete the mark, or to make it in the manner required by the statute, still the will is sufficiently executed if these facts are proved by two witnesses, who were present at the time, although Miner when he directed his name to be signed intended to make his mark also, and Thorpe, when he wrote the name, intended that Miner should make his mark."

This, we think, was clearly error. It assumes that although the testator directed his name to be written with the view of adding his mark, and thus making his signature, yet the will is completely executed before the mark is made. This cannot be so. It gives to an unexecuted intention the same effect as if fully executed. It gives to the statute a construction not sanctioned by its letter or its spirit. It is undoubtedly true the statute does provide, if the testator's name is subscribed by his direction and authority, it is a valid execution of the will. That, however, is when the testator has directed his name to be written as his complete signature. If so directed and intended, it becomes sufficient in itself. In such case the testator would not have intended to make any signature with his own hand, and none would be required. The learned judge holds the will may be sufficiently executed, although the testator failed to make his mark " in the manner required by the statute," and when neither the testator nor the scrivener had done any act, which either intended as a full execution of the will, and when the will would show on its face that it was not fully executed.

This error, however, was harmless in its consequences. It is shown by the testimony of four witnesses, who are uncontradicted, that the testator did make his mark. They all testify that his hand

[Main *v.* Ryder.]

was on the pen when his mark was made, and he thus assisted in making it. As then the plaintiff in error sustained no injury by this instruction we will not reverse therefor : Phelin *v.* Kenderdine, 8 Harris 354.

2. The evidence in regard to mental incapacity was very slight. It was fairly submitted to the jury, and substantially in the very language often used by this court. On this branch of the case, the learned judge is fully sustained by Thompson *v.* Kyner, 15 P. F. Smith 368, and the numerous cases therein cited.

3. The fact that the testator lived with a woman to whom he was not legally married, and that she and their illegitimate offspring were the devisees of much of his property, are urged as creating a presumption in law that the will was executed under improper influences. The case of Dean *et al. v.* Negley *et al.* is cited to support this view. The opinion of the judge in that case expressly declares that the court does not decide such relations create a presumption of law of undue influence; but leaves the effect thereof as a question of fact for the jury. To the same effect is the case of Rudy *v.* Ulrich *et al.*, 19 P. F. Smith 177. No clearly defined weight can be given to such testimony. Much must depend on the particular circumstances of each case. It is an element undoubtedly to be considered.

It appears that Miner had been entirely separated from his lawful wife and children for nearly thirty-five years. So far as it appears none of them had met him in all that time. She had not sought any reconciliation of her marital relations, nor they of their filial relations. They all resided in another state. She died in April 1869. For more than twenty-six years the testator and the woman named in his will as his wife, had lived and cohabited together as husband and wife. During all that time they so recognised each other. She had borne him several children. To them he also devised a portion of his estate. A separation for more than thirty years from his legitimate children naturally weakened his parental affection towards them. It needed no special effort on the part of his other family, with which he had lived more than a quarter of a century, to make them the objects of his bounty. The court fairly submitted the fact of his illicit associations to the jury to consider in determining the question of undue influence. On the whole record we discover no sufficient cause for reversal, therefore,

Judgment affirmed in each case.