## ESTATE OF HARRIET S. KNOX, DECEASED.

### APPEAL BY JAMES A. KNOX FROM THE ORPHANS' COURT OF ALLEGHENY COUNTY.

Argued November 6, 1889—Decided January 6, 1890.

[To be reported.]

1. A letter written in lead pencil, addressed to no one by name but clearly intended for those who should have control of the writer's property after her death, and requesting that certain things be given to persons named, is testamentary in character and entitled to probate as a will, if properly signed and proved; its precatory form being immaterial.

2. No greater effect can be given to § 5, act of June 3, 1887, P. L. 332, than the repeal of the requirement that a married woman's will shall be executed in the presence of two witnesses other than her husband; the section does not authorize a married woman to execute a will any more loosely than other persons.

3. The form which a man customarily uses to identify and bind himself in writing is his signature, whatever shape he may choose to give it, and under the statute of wills, as under the statute of frauds, what is a sufficient signature depends largely upon the custom of the time and place, the habit of the individual, and the circumstances of the particular case; it is not essential that the full name be signed.

(a) The autograph will of a married woman, living apart from her husband, was without the usual testamentary formalities, and in the form of a letter addressed to no one, but clearly intended for her mother or other members of her own family; her identity was made certain by references in the body of it, but it was signed with her first name only and unwitnessed.

4. It being shown that the will was written in 1888, that the testatrix had a repugnance to using her husband's family name, and habitually signed her first name, alone, in her correspondence, and it being clear on the evidence that she intended a complete execution of the instrument, such signing was sufficient under the act of April 8, 1833, P. L. 249, and its supplements.

Statement of Facts.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILL-
IAMS, McCOLLUM and MITCHELL, JJ.

No. 218 October Term 1889, Sup. Ct.; court below, No. 186
June Term 1889, O. C.

On December 14, 1888, James A Knox, husband of Harriet
S. Knox, deceased, entered in the court below his appeal from
the decision of the register of wills, admitting to probate, as the
last will and testament of said deceased, an instrument written
with a lead pencil upon three of the four pages of an ordinary
folded sheet of letter paper, of the following form and tenor:

"A few little things I would love to have done. Always
keep Vicie and Pet, if possible. Mama to have everything she
wants, with a few exceptions of remembrances. Please let sis-
ter have my house rent as long as she may live, then may my lit-
tle namesake have it. The money in Pittsburgh Savings Bank,
for Bessie, but just let it be until she is eighteen years old.
Please send something I have painted to Miss Judkins, also to
Lee. A box in attic I have fixed for Dollie Good, and please
Mama always remember her, and help her whenever you can.
My diamond pin and largest stone ring and bracelets for Mama.
The next size stone in ring for Bessie, also locket and chain,
and the next for Harriet, also Auntie's locket not to have un-
til old enough to appreciate it. Please send seal sacque to Lena
Johns, and fur circular to Katie Good, my beaver set to Dollie
Good. Give Jane my blue suit, also please take one hundred
dollars out of the rent of next quarter, October, and give her
for a nest-egg—she is so good and loves Vicie. The $1,000
Auntie left me, please give to Lee $500, and sister $500. My
coral to Ella McKinney and a plain gold ring to Dan. McK.
Sewing machine to sister, and have her take some money, get
nice books and give one to each one of my Sunday school class
of 1885, which I left, when going to New Brighton. Please
have just my baptismal names on stones, daughter of E. J. and
Felician Slataper. Doctor Dunn would give you the list of
names, about eleven or twelve girls. My large arm-chair to
Dr. Strom. Take good care of Vicie 'somebody' as long as
she lives. Saturday.

                                        HARRIET."

The grounds of the appeal, and of the prayer for the reversal

of the register's decree, were the following: 1. That said alleged will does not claim to be the last will and testament of said decedent. 2. That said alleged will is not dated. 3. That the signature of the alleged testatrix is not attested by any subscribing witnesses. 4. That said alleged will is not signed by the name of the alleged testatrix at the end thereof. 5. That said alleged will is not executed in accordance with the requirements of the acts of assembly in such case made and provided.

At the hearing of the appeal it was agreed by counsel that the testimony taken before the register should be treated as if taken before the court. That testimony was to the following effect:

Mrs. Knox died unexpectedly on October 27, 1888, at the home of her father, Felician Slataper, in the city of Pittsburgh, being then in the twenty-fourth year of her age. She left no children. From January 15, 1888, until her death, she was living apart from her husband, in consequence of differences that had arisen between them, and was an inmate of her father's family. Three days after her death, her only sister, Mrs. Samuel Kerr, found the paper under consideration in a portfolio which was lying in a cupboard, in the room occupied by the decedent at the time of her death. Four witnesses testified that they were familiar with the decedent's handwriting, and that in their opinion both the body of the instrument and the signature were written by her, and one of them testified that the signature ordinarily used by the decedent in her correspondence consisted of the word "Harriet" alone. The aunt whose bequest is mentioned in the paper, died on August 15, 1888.

After argument, the court entered a decree affirming the decision of the register and dismissing the appeal therefrom, OVER, J., filing the following opinion:

The writing admitted to probate by the register as the will of Harriet Knox, deceased, is testamentary in form, and if properly executed and proved the decision must be sustained.

It appears from the evidence of four witnesses that the whole paper as well as the signature "Harriet" is in her handwriting; that this was the signature used in her correspondence; and she is fully identified by the request made in the paper as to the inscription upon her tombstone. It is objected

however by the appellant that the signature " Harriet " is not such a signing of the paper as is required by the fifth section of the act of June 3, 1887, which provides as follows :

"A married woman may dispose of her property, real and personal, by last will and testament in writing, signed by her or manifested by her mark or cross, made by her at the end thereof, in the same manner as if she were unmarried."

The main purpose of the signature is to show the execution of the paper ; and if one were prepared in a formal manner, and it was evident that it was the intention to strictly comply with all the forms of law, the signature of the Christian name alone might not be considered sufficient evidence of its execution. There does not seem, however, to be anything in the act which requires the full name to be signed. And when the paper is as informal as this one, and signed by the testatrix in her customary manner, the signature of her Christian name shows its execution as conclusively as if she had signed her full name.

But it may be, that if this act is to be construed as to the signing of the paper as strictly as that of April 8, 1833, it would be held that it was not properly signed. The act, however, provides for the execution of a testament by the mark of the testatrix, and, as there is no rule which prescribes for it any particular form or structure, the word " Harriet " may be regarded as her mark : Hartwell v. McMasters, 4 Redf. 39 ; Schouler on Wills, § 304. It is not necessary that the name should be written with it, and, therefore, if considered as a mark, the paper is properly executed as a will : Long v. Zook, 13 Pa. 400.

If it was an ordinary mark or cross, it would be perhaps impossible to prove it except by witnesses who saw it made, but it is not necessary that they should be subscribing witnesses : Carson's App., 59 Pa. 498. In that case the question of the execution was treated as one of proof. And, as it is shown here by the testimony of four witnesses, and is not denied, that the signature " Harriet " is in the handwriting of the testatrix, the proof of the execution of the paper is ample, and the register was right in admitting it to probate. The appeal is therefore dismissed.

Exceptions, filed by James A. Knox, to the findings and decree of the court, were dismissed on September 4, 1879, whereupon James A. Knox took this appeal, specifying, inter alia, that the court erred:

5. In dismissing the appeal and sustaining the decree of the register admitting the paper in question to probate.

*Mr. R. D. Wilson* and *Mr. W. K. Jennings*, for the appellant:

1. If this paper had been executed prior to the passage of the act of June 3, 1887, P. L. 332, it unquestionably would not be a valid will. The only object of that act was to place married women upon an equality with other persons in the making of wills; it never contemplated introducing a method of execution by them more lax than that required in other cases. From both its spirit and its language we conclude that the rules governing the execution of a will under it are identical with those applying, under the other acts in force, to the execution of wills by other competent persons. The trunk of the system of wills now in force in Pennsylvania, is found in the act of April 8, 1833, P. L. 249; and a review of the cases decided under that act will show that the system established utterly excluded the doctrine of signing by construction, exacted a strict and literal compliance with the requirements of the statute, and forever repudiated all authority drawn from the English decisions: Stricker v. Groves, 5 Wh. 386; Dunlop v. Dunlop, 10 W. 155; Cavett's App., 8 W. & S. 24; Grabill v. Barr, 5 Pa. 444; Hays v. Harden, 6 Pa. 411; Asay v. Hoover, 5 Pa. 21. To such a point of strictness was the interpretation of the act carried, that a person who could not write was absolutely prohibited from making a will, it being decided that execution by a mark was not authorized. The court did not retrace its steps on this point, but left it to the legislature to authorize the use of a mark, which was done by the act of January 27, 1848, P. L. 16.

2. In the light of the decisions cited, can the word "Harriet" be called a signature? The common and most ordinary meaning of that word, which is the one to be preferred in interpreting a law supposed to be understood and used in every household, is, we submit, execution by writing the name of the party. To show that that has been the impression of this court,

Arguments.

we refer to the cases already cited, wherein the court, with relation to the mode of execution, made use of the word "name" thirteen times, the expression "proper signature" twice, and "signature by name" once. So, the legislature in the act of 1848 provides that every will etc. "to which testator's name is subscribed," etc., shall be valid. If signing means signing by name, we submit that this means the subscription of more than the Christian name or surname, or part of either. The form of signing should be enough to distinguish the person with reasonable certainty. However different the construction of the British statute may have been, under our law one of the functions of the signature is to designate who the testator is. How many thousand Harriets are there who might have signed this paper? The question is not what probability that the word "Harriet" was in this instance written by Harriet S. Knox, may arise out of the circumstances surrounding this paper, but whether, leaving everything else aside, folding the paper till nothing but the signature appears, this signing is a compliance with the legal requirements in the execution of a will.

3. The nearest case in point is Long v. Zook, 13 Pa. 402, and we contend that it is authority against the position of the court below. No case has gone so far as the lower court in this case. There is no urgent reason for going beyond the point to which the decisions of this court have gone, but many reasons against it. If "Harriet" is a sufficient signing, at what point can the court logically stop? Why not "Hat," or simply "H."? In view of the fact that no subscribing witnesses are required, the courts would then be at the mercy of any two witnesses, depraved or reckless enough to swear that a bare letter of the alphabet, without the individuality that appears in a complete signature, is the proper handwriting of the testator. This is not only reason, but is supported by the remarks of GIBSON, C. J., in Cavett's App., supra. But the court below held that while this form of execution could not be sustained as a signature, it might be as a mark. It required the act of January 27, 1848, P. L. 16, to authorize execution by mark. In construing that act, the reason for its passage should be borne in mind, and it should be confined in its effect to the remedy of the evil it was designed to cure. In it "mark or cross" is used in contrast with name or signature. It was not the in-

tention to permit the wholesome provisions as to signatures to be frittered away by construing an imperfect signing as a mark. A naked mark is not a signature: Greenough v. Greenough, 11 Pa. 497. Nor can an execution by mark be proved by the testimony of a witness not present at the execution: Shinkle v. Crock, 17 Pa. 159. So, if "Harriet" could be held a mark or cross within the statute, the requisite proof is lacking.

*Mr. Charles M. Thorp* (with him *Mr. John H. Hampton*), for the appellees:

1. Neither subscribing witnesses, nor witnesses present at the execution of the paper are required: Hight v. Wilson, 1 Dall. 102; Carson's App., 59 Pa. 493. Nor are these requisite even if the paper had never been seen by any human eye other than that of its maker, and its existence had never been acknowledged by him: Fosselman v. Elder, 98 Pa. 159. The only requirement, in such case, is to show by two or more competent witnesses that the decedent signed the paper, and the shortness of the signature will be unobjectionable if it is capable of proof. To sign, is not necessarily to write one's name. The test as to whether a paper is signed or not is, did the person subscribe it with the intention of signifying his assent to its provisions? This is the criterion applied under the statute of frauds, a signing by initials being held good: 1 Reed on Statute of Frauds, § 386; Sanborn v. Flagler, 9 Allen 474; Palmer v. Stephens, 1 Den. 478; Chichester v. Cobb, 14 Law Times, N. S., 433; Browne on Statute of Frauds, § 362. So any other figure or sign, intended to bind, is good: Brown v. Butcher's etc. Bank, 6 Hill 443 (41 Am. Dec. 755); Weston v. Myers, 33 Ill. 432.

2. The statutes of wills make no greater requirements than the statute of frauds. The same policy dominates both classes of statutes, and the same construction should be given to both: Main v. Ryder, 84 Pa. 217. The cases relied on by the appellant are obsolete; what they decided is not now law, the act of January 27, 1848, P. L. 16, having been the remedy for them. Not only, however, do these cases not decide this question in the appellant's favor, but their very language is decisive in our favor. They required handwriting, because it could be proved; and here we have handwriting which consists of a

word of sufficient length to be easily proved, and which is proved. Applying the test those authorities sought to establish, we have in this case an execution within the strictest construction of the act of 1833. The decisions since the act of 1848 are very liberal and remove all possible doubt on this question: Vernon v. Kirk, 30 Pa. 218; Long v. Zook, 13 Pa. 400; Main v. Ryder, 84 Pa. 217; Carson's App., 59 Pa. 493; Baldwin's Est., 16 W. N. 300; Jacob's Will, 21 W. N. 510.

3. The decisions of other courts should be persuasive, when the language of the statutes is the same and our own decisions are not antagonized. The construction of the English wills act is certainly no broader than should be that of our acts of 1833 and 1848, taken together. There are English decisions upholding signatures by initials: Re Savory, 15 Jur. 1042; Addy v. Grix, 8 Ves. Jr., 504; Baker v. Dening, 8 A. & Ell. 94; or, by stamping the name or initials: Jenkins v. Gaisford, 3 Sw. & Tr. 93; Re Emerson, L. R. 9 Ir. App. 443. A signature by an assumed name has been held to pass as the mark of testator: Re Redding, 2 Rob. 339. So in New York, in the case of a name imperfectly written: Hartwell v. McMasters, 4 Redf. 393; see 1 Jarman on Wills, * 78. Remembering that the entire paper is wholly in the handwriting of Mrs. Knox; that it is in form a letter, addressed especially to her mother, and is signed exactly as such a letter would be signed, and as she was accustomed to sign; that, as the request to put only her baptismal names on her tombstone shows, she disliked to use her husband's name; that she is completely identified by the references contained in the paper; and that no idea is or could be suggested that it is not a complete paper, we think it unnecessary and harsh to set aside her intentions for the reasons urged by the appellant.

OPINION, MR. JUSTICE MITCHELL:

The writing in question is clearly testamentary. Although it does not on its face purport to be a will, and in form is not a command, but a request, addressed to no special person by name, but plainly to those who should have the possession or control of her property, it has the essential element of being a disposition of property to take effect after death, and the precatory form is therefore immaterial: Fosselman v. Elder, 98 Pa. 159.

It being undisputed that the paper is in the handwriting of the decedent, and being testamentary in character, the only question left upon its validity as a will is the sufficiency of its execution by the signature "Harriet."

The paper is proved to have been written after the passage of the act of June 3, 1887, P. L. 332, and the fact that the decedent was a married woman is therefore unimportant. That act repealed the requirement that a married woman's will should be executed in the presence of two witnesses, neither of whom should be her husband, and put her, in respect to signature by herself, upon the same footing as men and unmarried women. No greater effect can be attributed to the statute. It certainly was not intended to authorize a married woman to execute a will any more loosely than other persons. We are therefore remitted to the general question whether a signature by the first name only may be a valid signing of a will under the act of 1833 and its supplements.

The condition of the law before the passage of the wills act of 1833 is well known. By the English statute of frauds all wills as to land were required to be in writing, signed by the testator. Under this act it was held that the signature of the testator in any part of the instrument was sufficient: 1 Redf. on Wills, c. 6, § 18, pl. 9, and cases there cited. The same construction was given to the law in Pennsylvania, and under the act of 1705, 1 Sm. L. 33, which required wills of land to be in writing, and proved by two or more credible witnesses, etc., it was even held that a writing in the hand of another, not signed by the testator at all, might be a good will: Rohrer v. Stehman, 1 W. 463. In this state of the law the act of 1833 was passed. It was founded on the English statute of frauds. 29 Car. II., the phraseology of which it follows closely, but with the important addition that the will shall be signed " at the end thereof." In making this change, it is undoubtedly true, as suggested by STRONG, J., in Vernon v. Kirk, 30 Pa. 222, that the legislature "looked less to the *mode* of the signature than to its *place*." Accordingly, the statute makes no definition of a signature, or of the word, signed. " It was only by judicial construction that . . . . . (the statute) was made to require . . . . . the testator's signature *by his name*: " STRONG, J., Vernon v. Kirk; and that judicial construction which held

that a mark was not a valid signature : Asay v. Hoover, 5 Pa. 21 ; Grabill v. Barr, 5 Pa. 441, decided in 1846, was changed, it may be noted, by the legislature as soon as their attention was directed to it: Act January 27, 1848, P. L. 16.

The purposes of the act of 1833 were accuracy in the transmission of the testator's wishes, the authentication of the instrument transmitting them, the identification of the testator, and certainty as to his completed testamentary purpose.    The first was attained by requiring writing instead of mere memory of witnesses, the second and third by the signature of testator, and the last by placing the signature at the end of the instrument.    The first two requirements were derived from the English statute ; the third was new, (since followed by the act of 1 Vict. c. 26,) and was the result of experience of the dangers of having mere memoranda or incomplete directions taken for the expression of final intention : Baker's App., 107 Pa. 381 ; Vernon v. Kirk, 30 Pa. 223.    These being the purposes of the act, and the legislature not having concerned itself with what should be deemed a signing, we must look dehors the statute for a definition.    As already said, the act is founded on the statute of frauds, 29 Car. II.    Under that act it has been held that the signing may be by a mark, or by initials only, or by a fictitious or assumed name, or by a name different from that by which the testator is designated in the body of the will: 1 Jarman on Wills, *78 ; 1 Redf. on Wills, c. 6, § 18, and cases there cited.    In this state, as already seen, it was held, on a narrow construction of the act of 1833, that a mark was not a signing ; but on the other points, so far as they have arisen, our decisions have been in harmony with those of the English courts.    Thus, in Long v. Zook, 13 Pa. 400, the will of David Long was held to be validly executed by his mark, although the mark was put to the name of Jacob Long.    In Vernon v. Kirk, 30 Pa. 218, " Ezekiel Norman, for Rachel Doherty, at her request," was held to be a valid signing under the act. And in Main v. Ryder, 84 Pa. 217, it may be noted that a mark was held to be a good signature, (subsequent to the act of 1848,) though put to a name which was not the testator's real or at least his original name, though it was one by which he had been known for some years in his own neighborhood. No question was raised against the will on this point.

The precise case of a signature by the first name only, does not appear to have arisen either in England or in the United States; but the principles on which the decisions already referred to were based, especially those in regard to signing by initials only, are equally applicable to the present case, and additional force is given to them by the decisions as to what constitutes a binding signature to a contract under the same or analogous statutes. Browne, On the Statute of Frauds, § 362, states the rule thus: "In cases where the initials only of the party are signed, it is quite clear that, with the aid of parol evidence which is admitted to apply to them, the signature is to be held valid." And see Palmer v. Stephens, 1 Den. 478; Sanborn v. Flagler, 9 Allen 474; Weston v. Myers, 33 Ill. 432; Salmon Falls Co. v. Goddard, 14 How. 446; Chichester v. Cobb, 14 Law T., N. S., 433. Though, therefore, we find no precise precedent, yet the analogies are all favorable, rather than otherwise, to the sufficiency of a signing by first name only, if it meets the other requirements of the act. These are matters depending on circumstances which will be considered further on. Looking beyond the decisions to the general use of language, what is understood by signing, and signature? Webster defines to sign as " to affix a signature to; to ratify by hand or seal; to subscribe in one's own handwriting;" and signature as " a sign, stamp, or mark impressed; . . . . . especially the name of any person written with his own hand, employed to signify that the writing which precedes accords with his wishes or intentions; a sign manual." All the definitions include a mark, and no dictionary limits a signature to a written name. There can be no doubt that historically, and down to very modern times, the ordinary signature was the mark of a cross; and there is perhaps as little question that in the general diffusion of education at the present day the ordinary use of the word implies the written name. But this implication is not even yet necessary and universal. The man who cannot write is now happily an exception in our commonwealth, but he has not yet entirely disappeared, and in popular language he is still said to " sign," though he makes only his mark. Thus in Asay v. Hoover, 5 Pa. 26, the witness says: " The name was written after the will was read to her, and after she had signed it. . . . . She was reclining in bed

when she *signed* it," although the signature the witness was testifying to was only a mark. But, even in the now usual acceptation of a written name, signature still does not imply the whole name. Custom controls the rule of names, and so it does the rule of signatures. The title by which a man calls himself and is known in the community is his name, as in Main v. Ryder, supra, whether it be the one he inherited or had orginally given him or not. So the form which a man customarily uses to identify and bind himself in writing is his signature, whatever shape he may choose to give it. There is no requirement that it shall be legible, though legibility is one of the prime objects of writing. It is sufficient if it be such as he usually signs, and the signatures of neither Rufus Choate nor General Spinner could be rejected, though no man, unaided, could discover what the ragged marks made by either of those two eminent personages were intended to represent. Nor is there any fixed requirement how much of the full name shall be written. Custom varies with time and place, and habit with the whim of the individual. Sovereigns write only their first names, and the sovereign of Spain, more royally still, signs his decrees only, " I, the King," (Yo el Rey.) English peers now sign their titles only, though they be geographical names, like Devon or Stafford, as broad as a county. The great Bacon wrote his name, Fr. Verulam, and the ordinary signature of the poet-philosopher of fishermen was Iz: Wa:. In the fifty-six signatures to the most solemn instrument of modern times, the Declaration of Independence, we find every variety from Th. Jefferson to the unmistakably identified Charles Carroll, of Carrollton. In the present day, it is not uncommon for business men to have a signature for checks and banking purposes somewhat different from that used in their ordinary business, and, in familiar correspondence, signature by initials, or nick-name, or diminutive, is probably the general practice.

What, therefore, shall constitute a sufficient signature must depend largely on the custom of the time and place, the habit of the individual, and the circumstances of each particular case. As already seen, the English and some American cases hold that a signature by initials only, or otherwise informal and short of the full name, may be a valid execution of a will or a con-

tract, if the intent to execute is apparent.    To this requirement
our statute adds  that the signature must  be at the end, as evi-
dence that the intent is present, actual, and completed.    On
this point of the completed act, the use of the ordinary form of sig-
nature is persuasive evidence, and  the absence of it may be of
weight in the other scale.    As well suggested by the learned
judge below, if a will drawn with formality, or in terms that indi-
cate the aid of counsel, or the intent to comply with all the forms
of law, be signed with initials or first name only, doubt would
certainly be raised as to the completed purpose of the testator
to execute it, and if then it appeared that his habit was to sign
his name in full the doubt might  become certainty ; while, on
the other hand, if it were shown that he usually, or even  fre-
quently, signed business or other important papers in the same
way, the doubt might be dissipated.    As in all cases where the
intent is the test, there can be no hard and fast legal rule as to
form.    The statute requires that the signature shall be at the
end, and that requirement must be met without regard to inten-
tion, but what shall constitute a signature must be determined
in each case by the circumstances.

Tested by these views, the will in the present case appears
to have been well executed.    Of the handwriting and of the
identity of the testatrix there is no question, and her completed
intent to execute the paper, as the expression of her testamentary
wishes, is attested at the end of it by a signature admitted to
be made by her, and shown to be in the form which she habitually
used.    The writing has not the usual formalities of a will, but
is in form a letter, addressed to no one by name, but clearly
intended for her mother, or such of her family as should assume
control of her property after her death; and the form of the
instrument might well account for the signature she was accus-
tomed to use, were it not still more clearly explained by the
unfortunate differences with her husband, and her repugnance
to using his name, as shown by her avoidance of it in her cor-
respondence, and her direction not to put it on her tombstone.
On the evidence, it is clear that the testatrix intended this as
a complete execution of the instrument, and we find nothing
in the law to defeat its validity for that purpose.

Judgment affirmed.