## Reilly's Estate.

*Wills—Execution—Physical disability—Signature by third person at testator's direction—Mark—Act of 1917.*

1. A will is properly executed by the direction and authority of the testator within the meaning of section 3 of the Wills Act of June 7, 1917, P. L. 403, where his name was written by the scrivener in his presence and he then made his mark and subsequently witnesses were called in, before whom testator, after the will was read over in their presence, acknowledged having signed it by mark.

*Wills—Probate—Issue—Objection by one not interested in estate.*

2. An issue to determine whether a will is validly executed will not be granted at the instance of one who would have no interest in the estate under the intestate laws, if the will were declared invalid.

Exceptions to refusal of an issue to determine validity of will. O. C. Phila. Co., Oct. T., 1926, No. 3690.

The facts appear from the following extract from the adjudication of

GEST, J., Judge presiding at the hearing.—John Reilly died on April 2, 1926, at one, or perhaps two, o'clock P. M., leaving a paper writing, dated April 2, 1926, purporting to be his last will and testament, which was admitted to probate by the Register of Wills on April 13, 1926. . . .

On Nov. 23, 1926, Margaret Reilly, a sister of the decedent, took this appeal, and in her petition for citation prayed that an issue be awarded on the grounds that the decedent lacked testamentary capacity, that the writing was procured by undue influence of James Patrick Reilly and others, and that the writing was a forgery. . . .

According to the testimony, the decedent left personal estate amounting to $10,500 and real estate in Ireland valued at $1000.

John Reilly was, on the evening of April 1, 1926, severely burned in the course of his employment on the Pennsylvania Railroad. He was taken to the Presbyterian Hospital at eleven o'clock and died the next day, April 2, 1926, about two o'clock P. M.

The decedent's brother, James P. Reilly, and his sister, Ellen Anderson, were called to the hospital about midnight, or perhaps at one o'clock. The serious nature of the injuries being realized, a priest was summoned, about 12.30, when the last rites of the church were administered. The decedent stated to his sister that he desired to make a will. James P. Reilly and Mrs. Anderson's husband were taken by a police officer to the residence of Herman Wene, a notary public and real estate agent, No. 3628 Lancaster Avenue, and roused him about four o'clock. They requested him to come to the hospital to write a will, and Mr. Wene, a man totally without legal training or experience, rushed in where an angel might fear to tread, went to the hospital ward where Reilly was lying in bed, and was introduced to him by Mr. Anderson. According to Mr. Wene's testimony, Reilly, the testator, then dictated his will to Wene, who wrote it out as it was dictated, without interference or solicitation by any one, the testator interrupting him when he came to the part of the

will referring to Ellen Anderson's children, and telling him to insert "her two children." There were present, besides the testator, Wene, James P. Reilly and Mrs. Anderson. After the will was written, the witness read the will to the testator, who said it was all right and inquired if he should sign his full name, but Wene told him that he might make a cross if he wanted to, which the testator did with a fountain-pen handed him by Wene, and Wene then wrote the testator's name and put a circle around the cross-mark. Wene requested a nurse present to witness the will, which she declined to do as the hospital regulations forbade it. The notary then went into another room and found a night watchman there, who, on request, signed his name as a witness, which, of course, he had no business to do. The notary then told Mrs. Anderson and James P. Reilly to get witnesses, went away, and came back about six o'clock, when Samuel G. McCoy and Mary W. (or Mrs. Owen) Tomany were present, whom the decedent recognized. The notary then read the will to the testator and asked him to identify his cross-mark, which he did, and then the notary instructed the two witnesses to sign as such, which they did, in the presence of the testator, and he afterwards added the acknowledgment under his seal.

Samuel G. McCoy testified that he heard the will read to the testator and the latter said it was all right, but the witness could not remember whether he signed as a witness in the presence of the testator or not, but he did testify that Wene told the testator that he, the witness, was there for a witness to the will, and the testator nodded his head.

Mary W. Tomany, who signed her name as Mrs. Owen Tomany, said that Wene, the notary, told the testator, in reference to herself and McCoy, that these were the two witnesses, and read the will to the testator, who said it was all right, and recognized the signature to it, by which must be meant the cross he had put there and his name written by Wene. She said the testator answered to the question whether he recognized it, "Yes, I do;" but the witness did not remember whether she signed her name in his presence or not, though she said she did sign it in the hospital.

The testimony proves to my satisfaction that the testator was possessed of full testamentary capacity. There was an attempt made to show the contrary by physicians of the hospital, with special reference to the morphia administered to ease the intense pain caused by the burns sustained by the testator, but this testimony should be absolutely disregarded in view of the positive testimony of those who were present. Nor is there, in my opinion, any evidence of undue influence. The will was the unprompted and genuine expression of the testator's real intention. The omission of the contestant from his will is readily accounted for by the testimony concerning their relations to one another, and, so far from being unnatural, is quite the contrary. Indeed, the only argument against the will is that its execution by a mark was not in accordance with the Wills Act of 1917.

It may be observed, in the beginning, that the testator was possessed of some education and clearly knew how to write his name, though some times he used a mark, and it is certain that the mark was actually affixed by him. One of the witnesses said that the mark was not the testator's because the testator used to make a mark which was a smaller mark than that which appears on the will, but that testimony is inadmissible under Shinkle v. Crock, 17 Pa. 159.

Section 3 of the Wills Act of 1917 provides: "If the testator be unable to sign his name, for any reason other than the extremity of his last sickness, a will to which his name is subscribed, in his presence, by his direction and authority, and to which he makes his mark or cross, unless unable so to do, in

Reilly's Estate.

which case the mark or cross shall not be required, shall be as valid as though he had signed his name thereto: Provided, that such will shall be proved by the oaths or affirmations of two or more competent witnesses."

In my opinion, the execution of the will is clearly valid under section 3 of the act. The testator, as appears from the hospital records in evidence, was suffering from extensive burns of both arms, thorax, thighs and the skin of his cheeks and neck. His right shoulder was especially badly burned and also his left hand. The burns were technically stated to be of the first and second degree, and it may be observed that the receipt for the patient's clothing, taken from him at the hospital, was signed by Mrs. Anderson, instead of the patient. When the will was executed, he was in pain and was bandaged in such a way that it would be unreasonable to expect him to sign his name, as that would necessarily require a painful effort. In this case it is clear the testator's name was subscribed in his presence, and it is well settled that his direction and authority need not be express, but may be implied: Picconi's Estate, 4 D. & C. 245; Novicki v. O'Mara, 280 Pa. 411. The present case falls well within this principle, and the cases of Girard Trust Co. v. Page, 282 Pa. 174; Hughes's Estate, 286 Pa. 466, and the recent case of Carmello's Estate, Supreme Court [289 Pa. 554]. And as the will was subsequently read over to the testator, who approved it and recognized his mark and his name, as written by the scrivener, in the presence of Samuel G. McCoy and Mary Tomany, their testimony is amply sufficient.

*Walter Thomas (Henry M. Stevenson*, with him), for contestants and exceptants.

*James J. O'Brien (of Fox & Rothschild)*, for proponents, contra.

PER CURIAM, Aug. 24, 1927.—At the time of the filing of petition for citation to show cause why an issue should not be granted, the petitioner, Margaret Reilly, had no standing. She was not next of kin at the time of testator's death. However, an answer was filed by one of the legatees on his own behalf and for other parties in interest, and in due course—after replication—a hearing was had. The hearing judge heard the testimony, insisting, however, that an administration should be raised on the estate of testator's father and that estate made a party to the record, which was done. The hearing judge treated the contest on its merits, and for good and sufficient reasons, as set forth in his opinion, refused to award an issue. No one has excepted save Margaret Reilly, the petitioner, and her brother, Thomas Reilly. They have no standing to except. If the will is invalid, an intestacy follows and the estate passes to the next of kin, John Reilly, father of testator. John Reilly, the father, died in Ireland in October, 1926, some six months after the date of testator's death. The ancillary administrator in this jurisdiction has not excepted; and it is he alone who would take and transmit the estate to Ireland for administration and distribution under the laws of that country. However, as the respondents have not raised this question, we have examined the record with that critical care which an appellate court on appeal, or this court on exceptions, should bestow, and we find no reasons whatever for disagreeing either with the facts or the application of the law by the hearing judge.

Testator was fully conscious of what he wanted done; he himself suggested the making of his will; the scrivener was brought in by members of his family for this specific purpose, and he intelligently dictated his wishes. The drugs which had been administered to alleviate his pains in no way affected his memory, and his mentality was clear in naming those of this family to

### Reilly's Estate.

whom he desired his estate to pass. Had it been his purpose to leave all to his father—to whose support in Ireland he from time to time contributed—no necessity for a will existed, nor had he not wished to ignore the petitioner, either directly or through her father, for reasons apparent in the testimony, likewise there would be no reason for a will. But it is clear that he had a fixed purpose in mind as to the destination of his estate and was insistent upon its being properly carried out. The scrivener, a notary public by profession, unfortunately was not conversant either with the drawing of wills or the method of execution. He did seem to know, however, that one sick unto death usually made a mark—and he had this testator make a mark. This occurred quite early in the morning of April 2, 1926. This scrivener thought there should be witnesses to the mark—"I realized it was no account without any witnesses. So I told Mrs. Anderson and Mr. Reilly (sister and brother of testator and legatees named in the will) that wouldn't do; they would have to get some witnesses; the only thing about it, I wouldn't have to rewrite, resign it; I will read the will to him and ask him if that is the signature before the witness. . . ." Accordingly, the scrivener left the hospital with that understanding and sometime about six o'clock in the morning returned to the hospital. Mr. McCoy and Mrs. Tomany were there. In the presence of these two people the scrivener read the will to testator, and said to him then and there: "Now this is your cross-mark, isn't it?" Reilly said, "It is." I said, "You folks hear what he is saying? You sign as the witness that he verifies this to be exactly as he wishes." They signed and afterwards he took their acknowledgment as a notary public.

The argument of exceptants is largely confined to a criticism of the method of execution; they claim it to be improper as well as illegal. We cannot acquiesce in such contention.

By the Act of Jan. 27, 1848, P. L. 16 (supplementary to the Act of April 8, 1833, P. L. 249), it is provided that every last will and testament theretofore made or thereafter to be made, to which testator's name is subscribed by his direction and authority, "*or to which testator hath made his mark or cross*," shall be deemed and taken as valid, provided the other requisites under existing laws are complied with. In Main v. Ryder, 84 Pa. 217, this act was upheld by Mr. Justice Mercur (at page 223), when, in answer to the contention that the act was intended to apply to such cases only when testator, by reason of want of education, was unable to write, said: "We discover nothing in the act sustaining that view. It makes no mention of insufficient education or want of physical ability. It declares that form of execution sufficient in all cases." The act and reason for its passage is considered at some length in Vosburg's Will, 9 Pa. C. C. Reps. 243. The act, however, is in terms repealed by the Wills Act of June 7, 1917, P. L. 403, which act became effective on Dec. 31, 1917, and is stated to apply to the wills of all persons dying on or after that day. The reasons in repealing this former act appear in the commissioners' report. Section 3 of the later act is intended to replace the entire Act of 1848. As stated by the commissioners, it is intended to cover cases where a person is unable to sign his name, whether from lack of education or from physical weakness.

The hearing judge found testator's name was subscribed to the will in his presence; that it was read over to testator and approved by him in the presence of two witnesses; and that testator, in the presence of said witnesses, recognized his mark and his name as written by the scrivener.

He ruled, on the authority of Picconi's Estate, 4 D. & C. 245; Novicki v. O'Mara, 280 Pa. 411; Girard Trust Co. v. Page, 282 Pa. 174; Hughes's

Reilly's Estate.

Estate, 286 Pa. 466, and Carmello's Estate, 289 Pa. 554, that the direction and authority to subscribe testator's name need not be express, but may be implied; that in the instant case the name of testator was subscribed to the will at his direction and authority; that there was a proper execution within the meaning of the 3rd section of the Wills Act of 1917; and that a consideration of the terms of section 2 of said act was, therefore, unnecessary.

As we are in accord with the findings of fact and rulings of law of the hearing judge, all exceptions are accordingly dismissed; costs to be paid by the contestants.

HENDERSON, J., did not sit.