## Lilley's Estate.

*Spriggs, Marker & Rial,* for appellant; *Brownlee & Brownlee,* for appellee.

CRUMRINE, P. J., Dec. 17, 1927.—This is an appeal from the decision of the register of wills in refusing to admit to probate as the will of John Lilley a certain paper writing in the form of a letter, a copy of which is as follows:

"R. D.                                                              "Charleroi Feb. 9, 25.

"George I was. verry sorry to hear of Ruths haveing to go through an operration. Yet if it succeful and she mends from it, it may be allright, but it makes me think of her Mother, George.

"Please drop me a line as to her condition you tell her fore me she must pull out of this. I want to thak you both for what you have done for me. and if the God's are with me in the way of a good will I intend to fix things with all the heirs. Two differet men of diffirent companies saw me to day about leasing One of them said they would start in a month.

"Before anything is done I want you by appointment to meet who ever we decide on, here or in town to present If they mean business and I think they do. I will let you no. just finished letter to Ellis Lilley. about leasing. allso one to Will R. Can easily get one Eight, look things up George for you and Ruth & family are to benifit from this. As Stella and I talked you folks were to have this place when we were through.

"The first truck of a string of tools, was unloaded at top of hill on the John Snider farm to day, the same company that brought in the big well North West. I think I showed you the derrick. the best in the field. Decmber paid over $15,000 to stockholders.

"I am well. eat like a pig. if not raining in morning start work on road
                                                              "JOHN LILLEY"

The proponents claim that the words "As Stella and I talked you folks were to have this place when we were through" are testamentary in character and constitute a legal devise of the property in which Mr. Lilley lived.

Counsel for the proponents have argued very ably for their contention, and I can agree with practically all of their conclusions, both of law and fact, except the main and essential one, to wit, that this paper is testamentary in character.

It is undoubtedly true that no set form of words is necessary to constitute a valid will and that, if testamentary in character, the most informal expression of testamentary intent, if signed by the testator, is sufficient.

It is conceded, too, that the word "through," in the expression "when we were through," refers to the testator's death, and the expression should be construed "when we were dead." Clearly there was no attempt to make a gift *in præsenti*—but neither was there an intention to make a devise.

The letter shows very clearly what was in Mr. Lilley's mind. He was very much interested in the possibility of getting a gas well on his property. He had been approached by two different men who wanted to lease. He dwells on the size of a well just brought in on the John Snider farm, and tells how

much one well in the neighborhood has already paid. He says that if he gets a good well he intends to "fix things with all the heirs."

Now, why does he write the letter to Mr. Denny? Clearly he wants him to assist in transacting the business of leasing the land. An appointment is to be made for Mr. Denny "to meet who ever we decide on" as the proper person to lease to. He insists that the matter is of sufficient importance to earn Mr. Denny's attention—"look things up George for you and Ruth & family are to benifit from this." Then follows immediately the clause in question—"As Stella and I talked you folks were to have this place when we were through."

Clearly, Mr. Lilley intended—at least when the letter was written—that Mr. Denny and his family were to have the "place" at his death—but the trouble with proponents' contention is that there is nothing to show that he intended the letter to operate as a will.

Both of these conclusions are established by the testimony of A. C. Iseman. He says Mr. Lilley told him that he had written Mrs. Denny telling her she was "to have the place when [he] was through with it." But he then added that "he was going to Greensburg to have a will made to that effect."

I have not the slightest doubt but that if Mr. Lilley had gotten to make his will he would have left this property to Mrs. Denny or her family—but he did not get this done. And I am just as confident that he never thought that this letter of itself constituted a will or would operate to pass title to the property in question without anything more.

Counsel for the proponents in a very able and exhaustive brief cite many cases standing for the proposition that no set form of words is necessary to constitute a valid testamentary disposition of property, and several where the paper held admissible to probate was in form a letter, but in all of these cases where the writing was held to be a will the *animus testandi* was clear.

So in Knox's Estate, 131 Pa. 220, very frequently cited in this line of cases, the paper, while not having the formal characteristics of a will, made a complete and detailed disposition of the estate, and even provided for the lettering on the tombstone. The only real question in dispute was the sufficiency of the signature.

In Scott's Estate, 147 Pa. 89, the decedent had written a letter to his lawyer outlining the contents of a will which he directed to be drawn. After the letter was written and signed, however, the decedent said to his son, "that is as good a will as can be drawn; if anything happens to me, have that probated." The necessary testamentary intent was established by parol testimony. The Supreme Court said that the letter as written was "dangerously near" a will, but even here, where the contents of the proposed will were set out in detail, even to the naming of executors, the vital element—testamentary intent—still had to be supplied. It was not a will because it was a complete, signed statement of the testator's intentions, but because he adopted such statement as his will.

The paper in Gaston's Estate, 188 Pa. 374, while illiterately drawn, shows clearly on its face that it was intended to operate as a will, and the Supreme Court so held.

In Davis's Estate, 275 Pa. 126, the decedent had written a letter to a friend asking that at his death two enclosed certificates of deposit be delivered to two named beneficiaries. This writing was held to be testamentary in character, and so entitled to probate. It was a definite disposition of his property to take effect at his death.

Probably the case leaning farthest toward the proponents' position is that of Kimmel's Estate, 278 Pa. 435. On the day he died, the decedent wrote a

letter to his sons. He discusses the weather, the best way in which to cure meat, the family's health, the removal of some livestock, etc., and then closes with these words: "I have some very valuable papers I want you to keep fore me so if enny thing happens all the scock money in the 3 Bank liberty lones Post office stamps and my home on Horner St goes to George Darl & Irvin Kepp this letter lock it up it may help you out. . . ." The key to the decision that this letter was testamentary and should be probated as a will is in the words "Kepp this letter lock it up it may help you out." The court construed these words as an expression of the testator's intention that the letter itself should operate as a will and carry out the desire of the testator just expressed. Mr. Justice Sadler says: "It is difficult to understand how the decedent, probably expecting an early demise—as appears by the letter itself, and the fact of his sickness and inability to work, during the last three days of the first or second week preceding—could have possibly meant anything else than a testamentary gift when he said 'so if enny thing happens [the property specified] goes to George Darl and Irvin;' and why, if this was not intended to be effective in and of itself, he should have sent it to two of the distributees named in it, telling them to 'Kepp this letter lock it up it may help you out.' "

To repeat, in the letter before us, Mr. Lilley's intention as to what should become of the property is clearly expressed, but there is nothing to show that he intended the letter of itself to work such a disposition or believed that it had done so. This fact distinguishes the present case from any of those cited.

We should perhaps mention another line of cases referred to by the proponents. In Turner v. Scott, 51 Pa. 126, Mr. Chief Justice Woodward says: "The doctrine of the cases is, that whatever the form of the instrument, if it vest no present interest but only appoints what is to be done after the death of the maker, it is a testamentary disposition." It is in connection with this principle that counsel emphasize the importance of the word "through" as indicating that the property was not to pass to the Dennys till after the death of the decedent. Other cases distinguishing between words intended immediately to transfer property and those where it is not to take effect till after death are: Tozer v. Jackson, 164 Pa. 373; Coulter v. Shelmadine, 204 Pa. 120; Wolfe's Estate, 284 Pa. 169; Harrison's Estate, 196 Pa. 576.

It is, of course, true that no paper can be testamentary in character unless it be ambulatory in character and take effect as to disposition only after the death of the maker. But it does not follow that every paper which expresses an intention of what is to be done with the writer's property after his death is for that reason legally testamentary. The paper itself must first disclose of itself that it was intended to operate as a will, or that intention must be supplied by parol testimony, as in Scott's Estate, *supra*. In no event can there be a valid will without an *animus testandi*. The old rule of Stein v. North, 3 Yeates, 324, enunciated in 1802, has never been departed from. It is as follows: "*Sed per curiam.* Clearly this letter cannot operate as a will. Though no particular form of words is necessary to give validity to a will, yet all the books agree that the *animus testandi* is an indispensable ingredient. There must be an advised purpose to make a present disposition of the party's estate. Here it is but the signification of an intention to do a future act, and so not the testament itself, which must contain a present and perfect consent: Swinb. 8, 9."

For the reasons stated above, we feel that the register of wills committed no error in refusing to admit this paper to probate.

And now, Dec. 17, 1927, this cause came on to be heard on appeal from the decision of the register of wills, testimony was taken, and the cause argued at length; wherefore, it is ordered and decreed that said appeal be and is hereby dismissed, at the costs of the proponents.

From Harry D. Hamilton, Washington, Pa.