## Plate's Estate.   Plate's Appeal.

148   55
223   3254

*Will—Signature.*

Exactly what constitutes a signing has never been reduced to a judicial formula, but barring any sudden incapacity to complete the signature by reason of the extremity of last sickness, it is an indispensable element that the signature actually made shall be a full and complete signature according to the intention and understanding of the testator.

Execution of a will by a mark, authorized by the act of assembly, can only be by a mark made with the intention of executing the will.

Where the testator started to write his name and made a stroke which bore no resemblance to the form of mark ordinarily used for such purpose, and which two witnesses professed to recognize as the first part of the initial of his name, and then stopped and said, " I can't sign it now,"

*Held*, that the intention to execute by mark is affirmatively disproved.

Argued Jan. 27, 1892. Appeal, No. 78, July T., 1891, by Bettie Plate, from decree of O. C. Phila. Co., sustaining the appeal of Mrs. Sallie Runge from the order of the register of wills refusing to admit to probate an alleged codicil to the will of Herman Theophilus Plate, deceased. Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, McCOLLUM, MITCHELL and HEYDRICK, JJ.

The facts appear by the opinion of the court below, ASHMAN, J., which was as follows:

" He [decedent] was a bachelor, without any kindred nearer than cousins, and was then boarding with Mrs. Runge, the widow of his former partner, whose house he had made his home for fourteen years continuously, from a date preceding her husband's death. By his will, dated some years before, he had bequeathed to her for life or widowhood the income of $15,000. On Thursday, February 6th, he sent for counsel and told him that he desired to increase that provision to $25,000, and to give two additional legacies to charities.

" He asked to see his original will, but as that could not be found, counsel drew a codicil, providing therein for the charitable bequests, which was executed the following day; and he commenced the preparation of a new will in which he embodied the provision for the increased allowance to Mrs. Runge. The draft was in these words:

" 'PHILA., February 6, 1890.

" ' I, Hermann Theophilus Plate, make this my last will. I give and bequeath the income of twenty-five thousand dollars to be paid to the widow of my former partner, George Runge, for life, in semi-annual payments.'

" The paper was read over to the testator and the latter approved it, but refused to sign until the will should be found. Counsel saw the testator on the three following days, but the will not being produced he did nothing more with the paper. In his absence, Mr. Wiedig, the clerk and business agent of the decedent, tried to induce the testator to sign it, but was put off with replies, ' Not now,' and ' some other time.' On Sunday, the day preceding the death, Mr. Wiedig read the paper to him again and asked him if it was right and if he would sign it and the testator answered, ' Yes.'

" What followed, the witness narrated thus : ' I raised him up in bed; I went into the other room, I asked for a pen and ink, and a pen was handed to me and a pad about fourteen inches long, and I placed the paper before Mr. Plate ; I handed him the pen, and he made this stroke, and he stopped and said, " I can't sign it now," or something to that effect, and then he laid back upon the bed.'

" The stroke alluded to was described as the first up and down stroke of the letter ' H.' He was at this time excessively weak, and in the effort to write trembled so violently, according to the statement of Mrs. Runge, that she was overcome by the sight and left the room. Throughout his sickness his mental vigor declined with his waning physical strength, and he was said by the doctor to be flighty in spells. On Thursday, however, his mind was so clear that he conversed with his counsel at some length upon various topics connected with the details of his business and of his will. On Friday he executed the codicil with full intelligence of the nature of the act. His intellect remained substantially unchanged until Monday, but he grew physically weaker, so that on Sunday his condition was that of extreme debility. His mind, up to Monday, when he died, to use the doctor's words, ' was still right, from time to time, particularly if he was aroused. His replies were intelligent.' On this point all the witnesses agreed. On Monday, as the doctor testified, he was in a constant stupor and delirium, without any lucid intervals.

" The probate of the paper appears to have been refused upon the grounds; that it did not express the whole will of the testator, and that it was not properly executed. The first point rests on the circumstance that the writing was merely the beginning of the draft of a new will. But if the testator, for any reason, chose to adopt it as the final expression of his testamentary purpose, it certainly became his last will. The proof shows that he did so adopt it, and that he adopted it intelligently. The only real question in the case is whether, in the execution of the paper, he complied with the requirements of the statutes of wills. The act of 1833 declares that a will shall be signed at the end, unless the testator is prevented from signing by the extremity of his last sickness. The act of 1848 permits a testator to make his mark or cross in lieu of signing. Exactly what constitutes a signing has never been reduced to a judicial formula. Legibility is not a requisite ; if it was, the autographs of some of the most distinguished men, as MITCHELL, J., in Knox's Estate, 131 Pa. 229, pointed out, would have been necessarily invalid. Completeness is not a requisite ; in Palmer v. Stephens, 1 Denio, 478 ; Sanborn v. Flagler, 9 Allen, 474 ; Salmon Falls Co. v. Goddard, 14 Howe, 446, the initials; in Knox's Estate, supra, the first name, and in Williamson v. Johnson, 1 B. & Cress. 146, and Main v. Ryder, 3 Nor. 217, a fictitious name; and in Brown v. Bank, 6 Hill, 443, an indorsement in figures, were held a sufficient signing. The principle upon which these cases proceeded was, that whatever the testator or grantor was shown to have intended as his signature was a valid signing, no matter how imperfect or unfinished or fantastical or illegible, or even false, the separate characters or symbols he used might be, when critically judged. The principle is so just that any other rule would be cruel ; it respects the infirmities of age and sickness ; and so long as it can reach the intention, it does not scan with microscopic curiosity the grammar or the penmanship of the dying. We believe that in this instance, if the scrawl which the testator made was all that his failing strength permitted, and was meant by him to represent his name, it was a valid signature within the act. His remark : ' I can't do it now,' may have meant simply that he could not complete the signing. Yet unfinished as it was, it bore certain character-

istics which enabled two witnesses to say that they recognized it as the work of the testator. Even conceding that we may not hold it to be the signature of the testator, what is there to prevent it from being taken as his mark. That he himself regarded it as either the one or the other is reasonably certain from his remark after he had signed, ' That matter is fixed, is it?' and to the question 'What matter?' ' You know what I wanted to give her, Mrs. Runge; I want her to have that.' It was duly witnessed. Mr. Wiedig handed the pen and ink to the testator, and stood by him while he used them; Mrs. Runge stood at the foot of the bed, and saw the pen in the testator's hand and then turned and stood in the open doorway; and both she and her mother saw the paper in blank just before it was given to the testator, and immediately afterward when it bore his mark at the end. The evidence, which need not be detailed, sets it beyond question that the testator was never afterwards able to do more in the way of signing than he had done. He might have asked some one to sign for him; but if he had already signed or made his mark the law did not require him to call upon another. There is no reason to doubt the judgment or the truthfulness of the four witnesses, including the physician, who were present on Sunday, and who declared that he understood the nature of the testamentary act which he performed that day. We have then a person in extremis, but possessed of disposing ability; fully informed of the contents of the testament; attempting to sign the paper, and making in the proper place, a character which if it were too imperfect to be accepted as his signature, was unquestionably sufficient to serve as his mark; and all this testified to by two witnesses who were actually present. If, by a super-refinement of reasoning the last statement shall be objected to, we have at least the testimony of one witness who was present, supplemented by testimony as to the immediate act of disposition which fully supplied the want of another witness: Eyster v. Young, 3 Yeates, 511; Reynolds v. Reynolds, 16 S. & R. 87; Carson's Appeal, 59 Pa. 493.

" We think the paper should have been admitted to probate, and we therefore sustain the appeal."

Certain legatees under the will of the testator took this appeal.

*Errors assigned* were, (1) holding that testator intelligently adopted the incomplete draft; (2) that the alleged codicil was legally executed, either by signature or by mark; (3) that the execution of the draft as a will was legally proven; (4) in reversing the decision of the register and admitting the paper to probate.

*Gustavus Remak, Jr.*, and *George Junkin*, for appellants.

*John F. Keator* and *N. Dubois Miller*, with them *Henry Galbraith Ward* and *George W. Biddle*, for appellees.

OPINION BY MR. JUSTICE MITCHELL, March 28, 1892:

We are obliged to differ with the learned court below not on the principles of law but on their application to the facts of this case.

The codicil in question was not properly executed by a mark, for the conclusive reason that the stroke of testator's pen was not put there with that intention. The act of 1848 makes all wills valid " to which the testator hath made his mark or cross . . . . provided the other requisites under existing laws are complied with." It is not necessary for us to consider that part of the argument which is founded on the supposed failure of other requisites such as the presence of the testator's name, though in another's writing, for the identification of the mark, or the absence of two witnesses to the fact of execution. The statute in authorizing the execution of a will by a mark can only mean a mark made with the intent to execute the will thereby. Without such intent, paraphrasing the language of Chief Justice GIBSON in Greenough v. Greenough, 11 Pa. 497, " a cross, or a scratch, or a scrawl, or a dot, or a dash . . . . imports no more than would a blot or a stain, or any other accidental discoloration of the paper at the foot of the instrument." The evidence shows beyond all doubt that the testator did not intend to execute the codicil by a mark, or make the stroke of the pen in question for that purpose. On the contrary, he started to write his name and made a stroke, which bears no resemblance to the form of mark ordinarily used for such purpose, and which two witnesses profess to recognize as the first part of the initial of his first name Herman, and then putting the matter beyond all controversy, he stopped and said " I can't sign it now." The intention to execute by a mark is affirmatively disproved.

Nor is the codicil properly executed by a signature, for the signature is incomplete and the evidence shows that the testator so regarded it. The learned court below were quite right in saying " exactly what constitutes a signing has never been reduced to a judicial formula . . . . The principle upon which these cases proceeded was, that whatever the testator or grantor was shown to have intended as his signature, was a valid signing, no matter how imperfect or unfinished or fantastical or illegible, or even false, the separate characters or symbols he used, might be, when critically judged." But even by this test nothing is a signature unless it is meant by the signer to be such, and this requirement is destructive of the present case, for the facts do not show that the testator regarded this stroke of his pen as his signature. On the contrary, they show that not only to a critical judgment, but to the testator himself, there was no signature. His expression " I cannot sign it now," after the stroke had been made, proves conclusively that he did not consider that he had signed and intentionally postponed doing so until a future occasion.

In Knox's Estate, 131 Pa. 220, the subject of signatures was considered with much care, and cases were cited in which signatures lacking various elements of the full formal and complete name had been held valid, but in none of the cases there cited or since brought to our attention, was the signature incomplete to the testator's own understanding and intent. The result of the cases is thus expressed, " the English and some American cases hold that a signature by initials only, or otherwise informal and short of the full name, may be a valid execution of a will or a contract, *if the intent to execute is apparent.*" Further consideration confirms us in the correctness of this proposition, but barring any sudden incapacity to complete by reason of the extremity of last sickness, of which there can be no claim here, it is an indispensable element that the signature actually made shall be a full and complete signature according to the intention and understanding of the testator.

The undisputed facts in the present case show conclusively that the completed intent to execute this codicil in any way whatever is entirely wanting.

Decree reversed at the cost of the appellees.