## Prescott's Estate

*Gunnison, Fish, Gifford* and *Chapin*, for proponents.

*Charles M. Dale, Enoch C. Filer, George M. Mason* and *Robert L. Roberts*, for contestants.

WAITE, P. J., September 25, 1933.—Charles Prescott, also known as Charles W. Prescott, also known as C. W. Prescott, died in Erie, Pa., November 20, 1932. A writing alleged to be his last will and testament, dated November 17, 1932, was duly probated, and letters testamentary issued to Frank Wallace and Second National Bank of Erie, Pa., on November 23, 1932. The matter now comes before the court on appeal by Mary E. Prescott and Josie F. Prescott, his sisters, who are also his next of kin and only heirs at law, from the decision of the register of wills admitting to probate a certain writing purporting to be the last will and testament of said Charles Prescott, and alleging, inter alia, the following reasons therefor: (1) The decedent was not of sound and disposing mind, memory, and understanding; (2) the instrument was prepared by and the decedent's signature procured through the undue influence of Dr. Elmer Hess, the decedent's attending physician; (3) the instrument was not executed in conformity with the Wills Act of 1917.

The petition also asks permission to produce before the register of wills a certain other writing alleged to be the last will and testament of said decedent, dated August 17, 1927, wherein his entire estate, after the payment of funeral expenses and costs of administration, is given, devised, and bequeathed, share and share alike, to the above-named sisters, and Charles M. Warner and Lyle L. Salsbury are named as executors.

An answer was filed by the said executors denying the allegations above set forth and also denying that petitioners are entitled to the relief prayed for. A large amount of testimony was taken and the matter fully argued before the court on July 27, 1933.

The petition in the present case does not ask for an issue, as is usually done in such appeals but, in view of what was said in Wagner's Estate, 289 Pa. 361, the court may, in our opinion, depending upon the circumstances, do one of three things, namely: Dismiss the petition, grant an issue in case of a substantial dispute, or set aside the probate.

The writing purporting to be the last will and testament is as follows:
"        Nov. 17-32.

I desire to leave 1-3 of my estate to Hamot and St. Vincent's Hospitals. $200,-000 to the Erie Boys' Club. $100,000 each to Mr. Vollmer and Mr. Warner. The balance of the estate to be placed in trust for my sisters while they live the principle to revert to Hamot and St. Vincent's Hospitals equally upon their deaths as an endowment.

I name Frank Wallace and the Second National Bank as my executors.
                        Charl
                    X

   his
Charles Prescott
   mark
Dr. Elmer Hess                                    RUTH H. KRASCHNESKE"

Decedent called this writing "a statement", not a will. The only thing in the writing indicating that it was intended as a will, or as anything other than "a statement", is the fact that executors are named, and this, according to the testimony, was done at the suggestion of the scrivener. However, the fact that executors are named in the writing is, in our opinion, sufficient to make it testamentary in character.

The hospitals named in the writing and the Erie Boys' Club are charitable institutions. As the alleged will was executed less than 30 days before decedent's death, the bequests to said institutions are void in Pennsylvania, under section 6 of the Wills Act of 1917, relating to bequests and devises for religious and charitable uses, so far as decedent's personal property is concerned, which embraces by far the greater part of the estate, and also as to any real estate situated in the Commonwealth of Pennsylvania. It has been intimated that the decedent may have left some real estate holdings in Florida and possibly an old homestead in New Hampshire. The distribution of any such real estate situated outside of the Commonwealth of Pennsylvania would be governed by the law of the situs, and whether or not the devise to the charities above mentioned would be void as to such real estate would depend upon whether or not the statute of mortmain or other law with like effect has been adopted and is in effect in any such other State.

It therefore appears that whether this estate is distributed under this writing or the alleged will dated August 17, 1927, or under the intestate laws of this Commonwealth, the sisters named in both alleged wills, being decedent's only heirs at law, will receive by far the greater part of this estate. The only other persons who would be directly affected by a failure to sustain the present will are Charles Warner and Anthony Vollmer and the charitable institutions as above set forth.

The record shows that Charles W. Prescott was a man 79 years of age. He was never married, and had lived in Erie the greater part of his life. He was actively engaged in business, being president of Trask, Prescott & Richardson Company, a large department store, a director in Lovell Manufacturing Company, and also a stockholder in Germer Stove Company and Erie Bolt & Nut Company, and had large investments in stocks, bonds, and other property. He was a man of strong will and of keen business judgment, not likely to be easily

influenced. He had accumulated a large fortune, amounting at the time of his death to several million dollars, notwithstanding the depreciation in the value of his holdings during more than 3 years of a severe business depression, continuing to the time of his death.

He had been in good health in both mind and body, up to a few months preceding his death, when some of his associates noticed he was failing and seemed weak and drowsy at times. One witness testified that on one occasion, when presiding at a directors' meeting, he went to sleep; while another witness testified that at another directors' meeting which he attended he not only did not go to sleep himself but would not permit anyone else to do so. He attended to his own business interests, which were large and varied; did his own banking; and consulted with his bankers and associates, about investments and other important business matters, down to almost the very day he was taken to the hospital, November 12, 1932, eight days preceding his death. His illness was kidney or prostate trouble, necessitating frequent urination, getting him up frequently at night and causing loss of sleep, which may account for his drowsiness in the daytime. He was being treated by Dr. Charles Kemble and refused to go to a hospital for observation or treatment, although frequently urged to do so by Mrs. Trask, the wife of a former partner in whose home he lived, and by other intimate associates—he had no relatives in the city.

Finally, his illness gradually becoming worse, after insistent urging amounting almost to coercion, he consented to go and did go to Hamot Hospital on November 12th for examination and treatment. Dr. Elmer Hess, an expert surgeon and urologist was, at decedent's request, called in to assist Dr. Charles Kemble, his regular physician. His case was diagnosed as "arterio-sclerosis, with a very bad gastro intestinal tract, with enlargement of the median lobe; hypertrophy of the prostate and with all of the train of symptoms that a patient has, who is an elderly patient—so-called prostatic wreck."

On November 14, 1932, he was given a small dose of morphine, preparatory to a cystoscopic examination, from the effects of which, by reason of his weakened physical condition, he passed into a coma lasting for about 2 days. The examination was made on November 14th. On the morning of November 17, 1932, he had apparently recovered from the influence of the morphine and seemed much better. He recognized and conversed with his nurses, physician, and several friends who called—seemed more hopeful of recovery and agreed to coöperate with his physicians and nurses. His condition was so much improved that those who talked to him seemed hopeful of his recovery. He refused Dr. Hess's suggestion to send for some of his closest friends and business associates, his banker, his lawyer, and at the suggestion that his minister be sent for, said: "Absolutely no." He then said to Dr. Hess: "Take a statement"; when the writing alleged to be his last will and testament was prepared and signed, under circumstances hereinafter more fully related. After that, his condition grew worse and he died on November 20, 1932, at 5:25 a. m.

The execution of wills, other than nuncupative, in Pennsylvania is governed by sections 2 and 3 of the Wills Act of June 7, 1917, P. L. 403, which are as follows:

"Section 2. Every will shall be in writing, and, unless the person making the same shall be prevented by the extremity of his last sickness, shall be signed by him at the end thereof, or by some person in his presence and by his express direction; and, in all cases, shall be proved by the oaths or affirmations of two or more competent witnesses; otherwise, such will shall be of no effect: Provided, That the presence of dispositive or testamentary words or directions, or the appointment of an executor, or the like, after the signature to a will,

whether written before or after the execution thereof, shall not invalidate that which precedes the signature.

"Section 3. If the testator be unable to sign his name, for any reason other than the extremity of his last sickness, a will to which his name is subscribed in his presence, by his direction and authority, and to which he makes his mark or cross, unless unable so to do,—in which case the mark or cross shall not be required,—shall be as valid as though he had signed his name thereto: Provided, That such will shall be proved by the oaths or affirmations of two or more competent witnesses."

The report of the commission appointed to codify and revise the law of decedents' estates in Pennsylvania, 1917, says, relative to the first part of section 2 (See Remick's Statutory Law of Decedents' Estates in Pennsylvania, 130 et seq.) :

"The first part of the section as now reported is copied from the present law. Its language is vague, if it be literally interpreted, but its meaning has been so often elucidated by the decisions of the courts that the Commissioners have felt it to be unwise to remould it, and, for the sake of achieving technical clarity of expression, raise new questions which would excite litigation."

"Note.—This is Section 6 of the Act of 1833, 4 Purd. 5120-26, with the addition of the proviso."

Relative to section 3, the commission also says:

"The new section is intended to cover cases where a person is unable to sign his name, whether from lack of education or from physical weakness. The provision that the mark may be dispensed with if the testator be unable to make a mark is intended to cover such a case as that of a man who lost both arms or is paralysed."

"Note.—This is substituted for Section 1 of the Act of January 27, 1848, P. L. 16, 4 Purd. 5126-7, omitting the provisions as to wills theretofore made."

Under the above-quoted sections, four methods for the execution of wills are provided, two under section 2, which for convenience, we designate methods I and II, and two under section 3, which we designate methods III and IV. Method I is "signed . . . at the end thereof", as directed in the first part of section 2. Method II is where the testator "shall be prevented by the extremity of his last sickness" from signing, in which case the will shall be signed "by some person in his presence and by his express direction", as directed in the last part of said section 2. Method III is where the testator is "unable to sign his name, for any reason other than the extremity of his last sickness", in which case a will "to which his name is subscribed in his presence, by his direction and authority, and to which he makes his mark or cross", as directed in said section 3, is properly executed. Method IV is where his name is subscribed as prescribed in method III, but no cross or mark is required, the language in that part of said section 3 being "unless unable so to do [that is, make his cross or mark as required under said method III],—in which case the mark or cross shall not be required".

We may also add that under the Act of January 27, 1848, P. L. 16, it was held that, notwithstanding a testator was "able to write his name himself", he might nevertheless execute a will by directing another to sign his name for him, if he so desired. See Main et al. v. Ryder et al., 84 Pa. 217, and Brennan's Estate, 244 Pa. 574, 578. In our opinion, the same is true under the Wills Act of 1917.

Although a person be in "the extremity of his last sickness", as set forth in section 2 (method II), nevertheless this does not preclude him from executing a will by signing at the end thereof, as provided in method I, if he is able to do so, as is shown by the opinion of the court in Wilson's Estate, 88 Pa. Superior Ct. 556, where the signing was by a mark or cross alone. Nor even

though a testator "be unable to sign his name, for any reason other than the extremity of his last sickness", as set forth in section 3 (methods III and IV), is he precluded from executing his will "signed . . . at the end thereof" (by mark or cross or otherwise), if able to do so, as provided in said section 2 (method I) as is shown by the reasoning of the court in Wilson's Estate, supra, and in Reilly's Estate, 92 Pa. Superior Ct. 314. The "signing at the end thereof", as provided in section 2, may be by mark or cross, or by initials or anything less complete than a full name, if clearly made and intended as a complete signature: Knox's Estate, 131 Pa. 220; Wilson's Estate, supra; Reilly's Estate, supra. We will discuss these cases further in this opinion, as well as point out the distinction between "signed" as used in section 2, and "sign his name" as used in section 3.

Since the words "extremity of his last sickness" are used in both sections 2 and 3 of the Wills Act, it is first necessary to determine their exact meaning in order properly to construe those sections. Bouvier defines last sickness as "that of which a person dies"; and, in extremity, as "when a person is sick beyond the hope of recovery, and near death, he is said to be in extremis." In section 4 (a) of the Wills Act, relating to the execution of nuncupative wills, the word "extremity" is not used, "last sickness" alone being employed. These words alone are manifestly less restricted in meaning than when the word "extremity" is added to "last sickness", as used in both sections 2 and 3 of the act, relating to the execution of written wills. But the words "last sickness" alone, as used in relation to nuncupative wills, have been restricted within very narrow limits by the leading cases in Pennsylvania: Hutton, Wills in Pennsylvania, 153-155; Rutt's Estate, 200 Pa. 549; Munhall's Estate, 234 Pa. 169, and cases there cited. See also Plate's Estate, 148 Pa. 55, 60. There must in such "last sickness" be both the imminence of death and a realization of that fact or condition by the testator. The testimony of both Dr. Kemble and Dr. Hess, the nurses, Mr. Warner, and Mr. Vollmer is to the effect that Mr. Prescott seemed much better the morning of November 17th, the day the alleged will was executed, although, in response to inquiries by Dr. Hess as to how he was feeling, he replied "rotten." He recognized all those who talked with him, asked Mr. Warner and Mr. Vollmer what they were doing there, and, characteristically of him, suggested to Mr. Vollmer that he should be getting back to the store. All these witnesses seemed to have been encouraged by his condition and at least somewhat hopeful of his recovery, and Mr. Prescott himself agreed to coöperate with the doctors and nurses with this end in view. There is nothing in the testimony showing either a realization of or the actual imminence of death. Nor was there any "express direction" to any person "in his presence" to sign the writing for him, and no evidence to show that he was unable to make such a request had he so desired. We must therefore conclude that decedent was not in "the extremity of his last sickness" and that the will was not executed as provided in that part of section 2 (method II).

It is to be observed that the language used in section 2 of the act is "shall be signed by him at the end thereof," while in section 3 the language used is "if the testator be unable to sign his name". Since signing has been held to include not only the full name but also a mark or cross or any other signing clearly intended as a signature, the word "sign" manifestly has a more comprehensive meaning than the words "sign his name", and, as said by Mr. Justice Walling in construing another feature of these same sections in Novicki v. O'Mara, 280 Pa. 411, 416: "A change of language in separate provisions of a statute is prima facie evidence of a change of intent: Endlich on the Interpretation of Statutes, sections 382, 383." We must therefore conclude that "sign his name" as used

in section 3 (methods III and IV) was not intended to take away the right to "sign" as provided in section 2 (method I), if the intent to execute be clearly shown, even though the testator may "be unable to sign his name, for any reason other than the extremity of his last sickness", as provided in said section 3. In other words, even though decedent in the instant case was unable "to sign" his name for "any reason other than the extremity of his last sickness", which would include physical weakness, he might still be able to execute his will by mark or cross or otherwise under the first part of section 2 (method I). See Wilson's Estate, 88 Pa. Superior Ct. 556, 560, and Reilly's Estate, 92 Pa. Superior Ct. 314.

This construction seems even more imperative when we remember that under said section 3 (method IV) not even testator's mark or cross is required when he is unable to make it "for any reason other than the extremity of his last sickness". Of course, in such case, there being no implied ratification, as is the case when the mark is made after the signing of testator's name by another "in his presence, by his direction and authority" (method III), there would have to be other evidence clearly to show his adoption or ratification of his name so written, by actual acknowledgment or other evidence sufficient to justify such a finding. A careful consideration of the language of this part of section 3 would also seem to indicate that the Supreme Court in Novicki v. O'Mara, 280 Pa. 411, Girard Trust Co., Exec., v. Page et al., 282 Pa. 174, Hughes's Estate, 286 Pa. 466, and Carmello's Estate, 289 Pa. 554, had in mind only the particular facts in those and like cases, where the execution was clearly shown by the mark or cross made by the testator after his name had been signed by another, or as in Kelly's Estate, 306 Pa. 551, where there was held to be no execution because the mark was made by testator before his name was signed by another, rather than any possible cases of signing by mark or cross which might arise, bringing the execution under the first part of section 2, which we have designated as method I, and where a decedent, although unable to sign his name for any reason other than the extremity of his last sickness, as provided in section 3 (methods III and IV) may still be able to sign by a mark, cross or any other signing clearly indicating an intention to execute, under section 2 (method I).

Under the first part of section 2 (method I), it is provided: "Every will . . . shall be signed by him at the end thereof". This method of execution includes, under the authorities in Pennsylvania, not only a signing by the full name of the testator, but a signing by mark or cross, or "by initials only, or otherwise informal and short of the full name, may be a valid execution of a will or a contract, if the intent to execute is apparent": Knox's Estate, 131 Pa. 220, 231-232 (1890), cited and approved in Plate's Estate, 148 Pa. 55, 60, and in Kimmel's Estate, 278 Pa. 435, 440 (1924); Wilson's Estate, 88 Pa. Superior Ct. 556, 560-562 (1926), where the court said:

"The point decided in Knox's Estate was that the testatrix's first name, placed by her at the end of the paper, was a sufficient execution under the Act of 1833. But in discussing the question what constitutes a sufficient signing of a will under the Act of 1833, the court said: 'All the definitions (of the words 'sign' and 'signature') include a mark, and no dictionary limits a signature to a written name. There can be no doubt that historically, and down to very modern times, the ordinary signature was the mark of a cross; and there is perhaps as little question that in the general diffusion of education at the present day the ordinary use of the word implies the written name. But this implication is not even yet necessary and universal. The man who cannot write is now happily an exception in our commonwealth, but he has not yet entirely disappeared, and in popular language he is still said to 'sign,' though he makes

only his mark. . . . As in all cases where the intent is the test, there can be no hard and fast legal rule as to form. . . . What shall constitute a signature must be determined in each case by the circumstances.' In Plate's Estate, 148 Pa. 55, it was stated: 'Exactly what constitutes a signing has never been reduced to judicial formula. The principle upon which these cases proceeded was, that whatever the testator or grantor has shown to have intended as his signature, was a valid signing, no matter how imperfect or unfinished.' In Brennan's Estate, 244 Pa. 574, 581, the court said: 'Signing in the usual acceptation of the word and in the sense in which, presumably, it is used in the act (1833) is the writing of a name or the affixing of what is meant as a signature.' In Kimmel's Estate, 278 Pa. 435, the point to be decided was whether the word 'Father' signed at the end of a paper was meant as a signature. In considering the question, as controlled by the second section of the Wills Act of 1917, Mr. Justice Simpson said that it is necessary to look dehors the statute for a definition of what should be deemed a signing. He pointed out again that the act is founded on the statute of frauds, 29 Car. II, under which is was held that the signing may be by a mark, cited with approval Knox's Estate, supra, and Plate's Estate, supra, and stated that the doctrine of those cases has never been doubted. In all of the cases in our Supreme Court since Knox's Estate, supra, in which the question was, what is a sufficient signature under the Wills Acts of 1833 and 1917, the decision turned on the question, whether the word affixed was intended as a signature. While it is, of course, true that the making of a mark differs from the signing of the word 'Father' in Kimmel's Estate, in that the testator in that case was in the habit of signing his letters by the word 'Father,' there can be no doubt that the testatrix intended the mark made by her at the end of the writing as a completed signature thereto. Therefore, we are of opinion that the mark made by this testatrix constituted a signing by her within the meaning of the second section of the Wills Act. We adopt the following from the opinion of the court below: 'A mark so affixed may be said to be stronger evidence of the intendment of the signing and execution than where the testator subscribes himself by 'Father' or by some other relation, or by the informality of initials or a diminutive, because a mark or cross is used only in case of a signature to a writing of legal value.' "

The court found as a fact that Mary Jane Wilson was unable to sign in the extremity of her last sickness (page 559). But she signed by a mark (X) only. Her name was not written on the will at all. It therefore was properly executed only under the first part of section 2 (method I). It did not conform to the second part of that section (method II), because testator's name was not signed "by some person in his presence and by his express direction". Testator's name must be signed by another in methods II, III, and IV. The difference between method II and methods III and IV is this: Under method II, the last part of section 2, the will must be signed "by some person in his presence and by his express direction", while under both methods III and IV, section 3, "his name is subscribed in his presence, by his direction and authority," and this direction need not be express but may be implied. The "mark or cross" may be used if intended as a signature, in method I; is required in method III; but is neither used nor required in methods II and IV.

In Wilson's Estate, supra, the court expressly said (p. 559) : "The execution did not conform to the requirements of the third section, because the name of the testatrix was not subscribed to the will". Applying exactly the same reasoning, we say that the execution in that case did not conform to the last part of section 2 (method II), because it was not signed "by some person in his presence and by his express direction", as therein provided.

We thus see in the case of the will of Mary Jane Wilson, supra, that although a person may be in "the extremity of his last sickness", he may still be able to execute a will by signing, not his name, but by a "mark or cross" under the first part of section 2 (method I), as was the actual manner of execution in that case. From the same reasoning, it necessarily follows that although a person may be unable from "physical weakness" or "any reason other than the extremity of his last sickness to sign his name," he may in like manner still be able to execute his will under the first part of section 2 (method I) by a mark or cross, or a signature "by initials only, or otherwise informal and short of his full name . . . if the intent to execute is apparent." The intent with which it is done is the determining criterion.

Although we have not found a case in which a will was executed by mark or cross where the testator was "unable to sign his name, for any reason other than the extremity of his last sickness", we have on the other hand not been able to find a case, nor has any been called to our attention, holding otherwise. In Reilly's Estate, 92 Pa. Superior Ct. 314, it does not appear whether the name or the mark was first placed on the paper. If the mark was made first, in view of the ruling of the Supreme Court in Novicki v. O'Mara, 280 Pa. 411, and in Kelly's Estate, 306 Pa. 551, that would not be a valid execution under section 3 (method III) but as the testator in that case (Reilly's Estate, supra) twice specifically recognized the mark as his signature, that would in our opinion constitute a valid execution under the first part of section 2 (method I) of a testator "unable to sign his name, for any reason other than" as provided in section 3 (methods III and IV).

What was said by the Supreme Court in Kimmel's Estate, supra, and by the Superior Court in Wilson's Estate, supra, both decided since the Wills Act of 1917, is the last word upon the true intent and meaning of the first part of said section 2. We must therefore conclude that no change was intended or made in the significance or meaning of the words "sign" or "signature", which accordingly remain the same as before the Wills Act of 1917, and as set forth in Knox's Estate, 131 Pa. 220.

We therefore cannot agree with the contention of the contestants that the Wills Act of 1917 has in this respect changed the method of the execution of a will. Wilson's Estate, supra, when carefully analyzed, seems conclusive.

Having pointed out the distinction between the four different methods of execution of a will in Pennsylvania, the meaning of the words "extremity of his last sickness", the distinction between the meaning of "signed", as used in section 2 of the act, and "sign his name", as used in section 3, as well as the meaning of the word "signature" under the Pennsylvania authorities, let us now consider the testimony in the instant case relative to the attempted execution (1) by the writing of the letters "Charl", (2) by the making of a mark or cross by decedent, and (3) by the signing of his name by another person in his presence.

Two witnesses were present at the time of the signing, as required by the Wills Act, namely, Dr. Hess and the nurse, Miss Kraschneske, the subscribing witnesses. As to what was said and done at that time Dr. Hess, on direct examination, testified as follows:

"Q. I show you proponent's exhibit 'A' (showing witness the will) and ask you if your signature is on that paper? A. It is. Q. When was your signature placed on that instrument? A. On Thursday, I think, the 17th of November, wasn't it (witness referring to will)? Yes, November 17th. Q. And at what time was your signature placed on the instrument? A. I couldn't give you the exact hour. Sometime between 10:30 and noon. Q. Where did you put your

signature on that instrument? A. Here it is in the left lower corner of the paper. Q. And where were you when you placed your signature there? A. In Mr. Charles W. Prescott's room at Hamot Hospital. Q. Who else was present when you placed your signature there? A. Miss Ruth Kraschneske and Charles W. Prescott. Q. Does Miss Kraschneske's signature appear on that paper? A. It does, on the lower right-hand corner. Q. When was her signature placed on the paper? A. Immediately after mine. Q. And what was placed on that paper first, from the time when it was a blank sheet of paper, what was placed on it? A. You mean what was written on it? Q. Yes. A. The statement that was given to me by Mr. Charles W. Prescott. Q. And that statement concludes with the words 'I name Frank Wallace and the Second National Bank as my executors?' A. Yes, that is what it reads. Q. What was placed on the paper next after that? A. After that was done Mr. Prescott attempted to sign his name to the paper—wrote the word 'Charles.' Q. Then what was placed on the paper? A. Then a mark was placed on the paper for his last name. Q. Then what? A. Then I wrote on the paper, 'Charles Prescott' his mark."

On cross-examination Dr. Hess testified as follows:

"Q. You have been shown the will which has been probated in this case and you have identified your signature and that of Miss Kraschneske, as having been made in the room of Charles W. Prescott at the hospital at the time the will was executed. Whose mark appears on the will? A. Mr. Prescott's mark. Q. Who made the mark? A. Mr. Prescott. Q. Immediately before you witnessed it? A. Yes. Q. Who wrote the word 'Charles?' A. He did. Q. Was he unable, from physical weakness, to complete his signature? A. Yes. Q. And did he then make his mark? A. Yes."

Dr. Hess further testified as follows:

"A. I came back again around 10:30 or 11 o'clock. He was again conscious. He had been sleeping for some time, the nurse had reported to me. He sat there with his eyes closed and I spoke to him and he opened his eyes and I said 'How are you feeling', or some such remark as that. I don't recall the exact conversation of this, and he said 'Rotten' again. I said 'Mr. Prescott won't you please let me send for somebody to come down here and see you?' He said 'No.' I said 'Won't you let me send for your attorney, and your bankers?' And he said 'No.' And again I asked about sending for his ministers, and he said 'Absolutely No.' I said 'Do you want to sign this document you made earlier in the morning? He said 'Yes.' I handed it to Miss Kraschneske and I said 'Will you read it to him?' Q. Where were you at that time? A. I was sitting next to the window on the north side of the room, in the chair, and Miss Kraschneske was standing close to the foot of the bed on the opposite side, because the respirator was at the head of the bed, or the oxygen tank, and she read this statement to Mr. Prescott, and as I recall, I asked him if that was the way he understood it. Q. Who directed her to read it? A. I did. Q. She did read it to him? A. She did. Q. And asked him if that was what he wanted? A. Something like that, yes. Q. What did he say? A. 'Yes.' Q. What happened then? A. I told her to read it to him again and asked the question and he again said that was the way he wanted it. Q. Then what did he say? A. Then Miss Kraschneske handed him the pencil and the paper and he used the window of the oxygen tent as a sort of a desk, and he laboriously wrote the word 'Charles' and as he finished writing the word, the pencil slipped out of his hand and she gave it back to him, and I told him to make a mark for his last name, and he did. Q. He made the mark himself? A. Yes. I took the paper and wrote on it 'Charles Prescott, his mark.' Q. In his presence. A. Yes. Following that I wrote my name and Miss Kraschneske wrote hers. Q. All in his presence? A. All in his presence. Q. Was anyone else in

the room when this occurred? A. No. Q. Then you say, as I understand it, this will is as he dictated it to you and as was read over to him twice and assented to as being what he wanted done? A. Yes."

The testimony of Dr. Hess is corroborated in its essential details by that of the other subscribing witness, Miss Kraschneske, the nurse. Her testimony, however, is at variance with that of Dr. Hess when he says the name "Charles" was signed, her testimony showing that only the first letters down to and including the letter "L"—"Charl"—were written by Mr. Prescott, and this, as we have already pointed out, is shown by the will itself. Both agree that the mark or cross was made by decedent for his last name only, at the suggestion of, and before Dr. Hess wrote the name "Charles Prescott", and the words "his mark", both of which were written without decedent's "direction and authority.".

There is not a word of testimony to show that any other word was spoken to or by Mr. Prescott, or either of the witnesses, or that any act was done by any of them relative to the writing or its attempted execution. Mr. Wallace, president of the Second National Bank, and one of the executors named in the will, was notified and came to the hospital and received the writing from Dr. Hess. He saw and spoke to decedent, but nothing was said about the will. The testimony as to the conversation between Dr. Hess and Mr. Warner and Mr. Vollmer, relative to the will, is somewhat conflicting, but both of them seemed to have been pleased to know that the alleged will had been made. Mr. Clyde Langdon seemed to have learned in some way about the will, and talked with Dr. Hess about it. There is some conflict in his testimony and that of Dr. Hess relative to that conversation, he intimating that Dr. Hess indicated that Zem Zem Hospital for Crippled Children, to which Mr. Prescott had previously made a gift, might have been given a bequest in the writing, if Dr. Hess had thought of it. Dr. Hess denies that he made any such intimation. Conflicting as this testimony is, we do not regard it as of any great importance. So far as appears, nothing else was said to any other person, by either Mr. Prescott, Dr. Hess, or Miss Kraschneske about the alleged will or its execution.

Does this testimony show a proper execution of the alleged will by decedent under sections 2 and 3 of the Wills Act by any method?

Was the making of the letters "Charl" on the writing a signing "at the end thereof", as provided in the first part of section 2 (method 1)?

The will itself shows that decedent had written only the letters "Charl" when the pencil dropped from his hand. Dr. Hess is therefore demonstrated to be in error when he says that Mr. Prescott wrote the name "Charles". The letters "Charl" are not a completed part of his first name, Charles, nor are they an abbreviation thereof. There is no evidence to show that decedent either intended or considered it a completed signature. The testimony is that he was unable, "because of physical weakness", to complete the signature. We are therefore of opinion that this feature of the case is governed by Plate's Estate, 148 Pa. 55. In that case Herman Theophilus Plate being very ill, desired to execute a will. He was bolstered up in bed and given a pen and ink. He was at the time very weak. He made on the testamentary paper, at the place where the signature usually appears, the up and down stroke of a capital "H". He stopped and said "I can't sign it now." The language of Mr. Justice Mitchell, delivering the opinion of the court, can very appropriately be applied to the facts in the instant case when he said, page 59:

"The statute in authorizing the execution of a will by a mark can only mean a mark made with the intent to execute the will thereby. Without such intent, paraphrasing the language of Chief Justice Gibson in Greenough v. Green-

ough, 11 Pa. 489, 497, 'a cross, or a scratch, or a scrawl, or a dot, or a dash . . . . imports no more than would a blot or a stain, or any other accidental discoloration of the paper at the foot of the instrument.' The evidence shows beyond all doubt that the testator did not intend to execute the codicil by a mark, or make the stroke of the pen in question for that purpose. On the contrary, he started to write his name and made a stroke, which bears no resemblance to the form of mark ordinarily used for such purpose, and which two witnesses profess to recognize as the first part of the initial of his first name Herman, and then putting the matter beyond all controversy, he stopped and said 'I can't sign it now.' The intention to execute by a mark is affirmatively disproved."

And further, on page 60, the court said:

"In Knox's Estate, 131 Pa. 220, the subject of signatures was considered with much care, and cases were cited in which signatures lacking various elements of the full formal and complete name had been held valid, but in none of the cases there cited or since brought to our attention, was the signature incomplete to the testator's own understanding and intent. The result of the cases is thus expressed, 'the English and some American cases hold that a signature by initials only, or otherwise informal and short of the full name, may be a valid execution of a will or a contract, *if the intent to execute is apparent.*' Further consideration confirms us in the correctness of this proposition, but barring any sudden incapacity to complete by reason of the extremity of last sickness, of which there can be no claim here, it is an indispensable element that the signature actually made shall be a full and complete signature according to the intention and understanding of the testator.

"The undisputed facts in the present case show conclusively that the completed intent to execute this codicil in any way whatever is entirely wanting."

The incapacity in the instant case to complete the signature after writing the letters "Charl", when the pencil dropped from decedent's hand, was no more sudden or unexpected than in the Plate case, where the testator "stopped and said 'I can't sign it now'." The decedent in that case was very weak and was never able to sign afterwards. He became delirious the second day after the attempted signing and died the following day, and yet the court held that he was not in the extremity of his last sickness. In the instant case, we have already shown that the decedent, although physically weak, was not in the extremity of his last sickness. The essential facts and circumstances surrounding the attempted signing and subsequent death in the Plate case, and signing the letter "Charl" and the subsequent death in the instant case, are so very similar that the same conclusion must necessarily follow.

In Knox's Estate, 131 Pa. 220, a will executed by the first name "Harriet" alone, that being her customary way of signing her name, and it being clear from the evidence that she intended a completed execution of the instrument, was sustained. In Brennan's Estate, 244 Pa. 574, the signing of a letter (not mailed) by the words "Your misserable father" [sic] was held not to be a valid signing of a will because it was not his usual method of signing and did not show an actual completed intention to execute. In Kimmel's Estate, 278 Pa. 435, the word "Father" was held to be a valid signature to a letter testamentary in character, because it was testator's usual method of signing his name, together with the additional fact that the letter was mailed and showed a completed purpose or intention to execute. Even though Dr. Hess did think that decedent had written the first name Charles, instead of the first five letters "Charl", there is nothing to show that Mr. Prescott thought so. He had written only the letters "Charl" and would know better than anyone else that the word was incomplete. We must therefore conclude that the letters "Charl" written

at the end of this writing was not a signing thereof. The mark was made, so far as the evidence shows, only for the last name and not for the purpose of a complete name or signature. There is no evidence to show any such other intention or understanding on the part of the decedent. Moreover, he called it "a statement", not a will, and Dr. Hess called it, when speaking to decedent, "a document" and "a statement"—never a will.

Was the making of the mark or cross after the letters "Charl" a signing or execution of the writing, as provided in section 2 (method I)? This mark or cross, according to the uncontradicted testimony, has no reference whatever to the letters "Charl". The evidence shows that the mark or cross was made for decedent's last name, Prescott, after the pencil had fallen out of his hand and had been given back to him by the nurse. If then, as we must conclude from the testimony, the mark was made for the last name, Prescott, alone, that was not a signing or execution of the writing as a will, under the authorities in Pennsylvania, because there is nothing to show that the testator intended or considered it a complete signature, which, as we have already shown, is necessary whether the signing is by mark or otherwise: Plate's Estate, 148 Pa. 55, 60; Novicki v. O'Mara, 280 Pa. 411; Girard Trust Co., Exec., v. Page et al., 282 Pa. 174; Carmello's Estate, 289 Pa. 554.

When a testator's name is first signed to the writing "in his presence" and by his "direction and authority", the making of the mark or cross by testator thereafter is held to be a ratification or adoption by him of the name as written. That method of signing is authorized by section 3 of the Wills Act (method III). In Wilson's Estate, 88 Pa. Superior Ct. 556, a will was executed by mark only "in the extremity of her last sickness", but in addition to her mark there were the further facts that the testatrix, being unable to speak, "when asked if the writing was her will, nodded her head in assent", a virtual positive acknowledgment, and that she then "took the pen in her hand and make her mark unaided."

In Reilly's Estate, 92 Pa. Superior Ct. 314, where the will was executed by the signing of testator's name by another, as well as by the mark made by testator, although it does not appear which was done first, the court said, at page 317:

"The will was twice read to him at each of which times he approved it and recognized his mark and his name as written by the notary. In the presence of Mr. McCoy and Mrs. Tomany, witnesses of the will, he acknowledged the signature to be his and the will to be his. That the testator affixed his mark to the paper and acquiesced in the writing of his signature by Mr. Wene, is contradicted by no one and is made to clearly appear. The evidence establishes beyond reasonable doubt that the affixing of the mark was done by the testator; that the witnesses signed at his request; and that he approved of the signing of his name by Mr. Wene. An adequate state of facts was thus presented to bring the case within the provision of the Act of 1917 above quoted, and this amounted to due execution of the will."

In the instant case, Dr. Hess said: "Let him make his mark for the last name." Testator was then again given the pencil and made the mark or cross. Nothing else was done by testator. Not a word was spoken by either testator or the witnesses. We must also remember—as we have already pointed out— Mr. Prescott called this "a statement" and was asked if he desired to sign a "document", not a will, and that the naming of executors, which alone makes it testamentary, was at the suggestion of Dr. Hess. Nor was the signing by a mark or cross, alone, or when standing for the word "Prescott" alone, his usual or customary method of signing—in fact, there is no evidence to show that he ever so used his last name. Although decedent's name was signed in his presence

after the mark was made, there is no evidence to show that he either saw the writing of his name or the name after it was written. Moreover, after the making of the mark or cross, no word was spoken to decedent, and as he did no act and spoke no word there is absolutely nothing to show an intent, assent, adoption, ratification, or acknowledgment of the mark or cross as made, as a signature to the writing, whether it be called a statement, a document, or a will. We must therefore conclude that the mark or cross, as made by the decedent in the instant case, was not an execution of a will by signing "at the end thereof", as provided in section 2 (method I).

As the decedent was not in "the extremity of his last sickness" and as the writing was not signed "by some person in his presence" and by his "express direction", there was no execution under the last part of section 2 (method II).

As the testator was "unable to sign his name", because of physical weakness, as the evidence shows, and which is included in the words of section 3, "for any reason other than the extremity of his last sickness," let us next inquire whether there was an execution under that section (methods III and IV), keeping in mind that the mark was placed on the writing by the decedent before Dr. Hess wrote the name "Charles Prescott".

The first construction placed upon this section of the Wills Act, relative to the order of placing the mark and writing testator's name, is to be found in Picconi's Estate, 4 D. & C. 245, in which Judge Gest of the Orphans' Court of Philadelphia County said, at page 247:

". . . It is clear that the name of the testator was subscribed in the room where he was lying in bed, and we do not think it important that his name was written after he had made his mark; in other words, the order is immaterial in which the mark is affixed and the name subscribed. The two requisites are connected in the statute merely by the conjunction 'and', but there is nothing to indicate which should be made first in order of time, and where two things are necessary to complete a transaction, it is unavoidable that, in the phraseology of the statute prescribing both, one must of necessity be named before the other. It may be observed, however, that if the testator had affixed his mark to an instrument to which his name had already been subscribed in his presence, it might well be argued that his act amounted to a ratification of what appeared on the paper before him. This, however, was not the fact in the present case; the testator's name was written after he had made his mark, and the testimony is not sufficient to afford a basis for reasonable inference that he was at any time cognizant of the fact that his name had been written on the will. We are not convinced that the name of the testator was written by his direction or in such circumstances that he must have seen it so written, or that he ratified the act of the scrivener by anything that he said or did."

But in Novicki v. O'Mara, 280 Pa. 411, the first case construing this part of the act by an appellate court of this State, Mr. Justice Walling said (pp. 414, 415):

". . . the attorney being busy, drew the will in his office and gave it to Dunn, who returned to Mackin's home, called in the two subscribing witnesses and in their presence read the will to Mackin, who expressed satisfaction therewith, but, because of defective eyesight, instead of signing the will, handed the pen back to Dunn, who thereupon wrote testator's name and the latter came forward to the table and touched the pen as the mark, appearing in connection with the signature, was made."

The will was sustained under section 3 (method III).

". . . Mackin was not prevented from signing the will because of the extremity of his last sickness; therefore, the case does not fall within the second sec-

tion; but he was unable to sign his name for lack of eyesight, hence the case is covered by the third section."

In Girard Trust Co., Exec., v. Page et al., 282 Pa. 174, the name was placed on the will before the making of the mark. The court said, at page 176:

"For a considerable time previous to her death, decedent's eyesight had been failing. Her hands were distorted and the joints swollen from rheumatism, necessitating, for many years, the substitution of a mark for her signature. Some years before her death she had also suffered a stroke resulting in aphasia, which, at the time the will was made, had progressed to such extent that she could speak very little and only in monosyllables in reply to questions addressed to her. The will was prepared by an attorney who took it to decedent's house and there met her physician. These two persons witnessed the will. The attorney read it over to testatrix and asked her whether that was what she wanted and she indicated by a nod of her head that it was. The physician informed the lawyer she would be obliged to sign by a mark, whereupon he wrote the name of the testatrix to the paper and she made her mark with the assistance of the physician who supported her arm. Appellants contend these circumstances are not sufficient to show testatrix was unable to sign her own name and that her name was actually subscribed by another by her direction and authority within the meaning of the Wills Act of June 7, 1917, P. L. 403, section 2 of which requires the will to be signed by the person making it 'or by some person in his presence and by his express direction,' and section 3 provides that 'if testator be unable to sign his name for any reason other than the extremity of his last sickness, a will to which his name is subscribed in his presence, by his direction and authority, and to which he makes his mark or cross .... shall be as valid as though he had signed his name thereto.' It will be observed that, while section 2 requires 'express' authority from testatrix, this word is omitted in section 3 which requires merely that the name be signed 'by his direction and authority'. We have held that under section 3 an express request that another sign testator's name is unnecessary and that authority may be inferred from the fact that testator saw the name written and then signified his approval of the act by placing his mark under the signature: Novicki v. O'Mara, 280 Pa. 411."

The will was sustained under section 3 (method III).

In Hughes's Estate, 286 Pa. 466, decedent's name was placed on the paper before he made his mark. An issue was awarded upon other grounds.

In Carmello's Estate, 289 Pa. 554, 559, 560, the court said:

"Acquiescence is shown by the placing of the mark on the paper after the name is written, as here (Girard Trust Co. v. Page, supra; Wilson's Est., supra)".

It was held a sufficient execution under section 3 (method III).

As if to settle all controversy on this point, Mr. Justice Maxey, delivering the opinion of the court in Kelly's Estate, 306 Pa. 551, 555, said:

"A paper in form of a will and purporting to be a will is not a will until it is legally assented to by the person whose will it purports to be. A testator unable to sign his name (unless his inability to sign his name arises from the extremity of his last sickness: see section 2 of the Wills Act of 1917, and Wilson's Est., 88 Pa. Superior Ct. 556) can register his assent to the paper purporting to be his will only by the method prescribed by the third section of the Wills Act, supra. That method is this: First, his or her name must be subscribed to the will in his or her presence and by his or her direction and authority. Second,

after this is done, he or she must make his or her mark or cross at the appropriate place in the signature.

" 'A mark for a name or signature is the sign of a cross made in a little space left between the Christian name and surname, and the word "his" is usually written above the mark and the word "mark" below it': 2 Blackstone Com. 305. The making of a cross between the Christian name and the surname and the labelling of it as indicated by Blackstone is, when properly proved, accepted by immemorial usage as evidence that the maker of the cross adopted the signature as his own and assented to the document to which his signature was subscribed."

Probate of the will was set aside as not properly executed under section 3 (method III).

We have been able to find no case in the lower court where the mark was placed on the paper before the writing of testator's name by another person, where the will was sustained. In Picconi's Estate, supra, although the court held the order of writing the name and the mark immaterial, probate was refused for another reason, viz, the lack of ratification. In all the cases sustained in the Supreme and Superior Courts, the testator's name was first written and the mark then made to the name, except in Reilly's Estate, supra, where it does not appear whether the name or the mark was first made, and where, as we have already shown, the will could very properly be sustained under the first part of section 2 (method I). We therefore conclude that the writing in the instant case was not properly executed under section 3 of the Wills Act.

What the Supreme Court said in the above-cited cases refers only to cases where there is an attempted execution by a mark, accompanied by the name of the testator written by another person in his presence and by his direction, as provided in said section 3 of the Act, and not to cases where the mark was made before and independent of the writing of testator's name by another. In the instant case, the mark was made for the last name only, as we have already pointed out, and before decedent's name was written.

If what the Supreme Court has said in the last cases above cited is to be taken as applying literally to every case where a will is made by a testator who is unable to "sign his name, for any reason other than the extremity of his last sickness", although he is able to sign and does sign by mark or cross, as provided in section 2 (method I), then no will so signed is properly executed and if probated must be set aside, and all that we have said relative to such other cases is wholly unnecessary. No subordinate court, even supposedly learned in the law, could or would even presume to reverse an appellate court. All that we have said is based upon facts which, in our opinion, distinguish the instant case from the facts in the cases above cited. It was upon the facts in those particular cases that the principles therein stated were laid down by the Supreme Court, which never intended that any other construction should be placed upon them. So far as we have been able to find, the question arising upon this phase of the instant case, that is, the signing "by a mark or cross" by a person unable "to sign his name" "for any cause other than the extremity of his last sickness", has not been directly passed upon by any other court in Pennsylvania, although, as we have already pointed out, the conclusion which we have reached is sustained by the reasoning of the Superior Court in Wilson's Estate, and Reilly's Estate, supra. But the making of the mark or cross in the instant case was not intended as a signing or complete signature, as we have already pointed out.

To summarize our conclusions, this writing was not properly executed as a will, as provided in section 2 (method I) because there is no evidence to show that either the letters "Charl" or the mark was placed thereon by the decedent

with the intention of signing "at the end thereof", nor is it shown that either "Charl" or the cross, singly or when taken together, were either ratified, approved, acknowledged, or considered by him as a complete signature. Nor was it properly executed under section 2 (method II) because decedent was not "in the extremity of his last sickness" nor did he "expressly direct" any other person to sign his name. The writing was not properly executed under section 3 (method III) because, although unable to sign "his name" he did not either directly or impliedly "direct and authorize" any other person to sign his name for him and he did not make the mark after the signing of his name. Nor was it properly executed under section 3 (method IV), because although unable to "sign his name", he did not direct and authorize the signing of his name by another, and was in fact able to make a mark or cross, as is conclusively shown by the fact that he actually did make a mark or cross, just before his name was written.

The conclusion which we have reached, that this writing was not properly executed under the Wills Act, as alleged in reason three of the appeal, makes it unnecessary to discuss at length the other reasons alleging lack of testamentary capacity and undue influence. We do not find either of these reasons sustained by sufficient evidence. Less mentality is required to make a valid will than to transact ordinary business: Aggas v. Munnell et al., 302 Pa. 78. The burden of proof was upon the contestants: Grubbs et al. v. McDonald et al., 91 Pa. 236; and was not shifted by proof that Dr. Hess was a physician on the staff of Hamot and St. Vincent's Hospitals; nor by proof that he was personally, but not financially, interested in the Boys' Club: Darlington's Estate, 289 Pa. 297; Channon's Estate, 266 Pa. 417.

Testator was weak in body, somewhat forgetful, somewhat drowsy at times—probably from loss of sleep at night because of the nature of his illness—and during the 2 days preceding the writing of the will was in a comatose condition, owing to the administration of morphine by his physicians, preparatory to a cystoscopic examination. But on the morning of the making of the writing probated as his will, he had come out from under that influence or condition, and appeared much better—recognized both of his physicians, the nurses, and all his friends who called, except Miss Stevenson—at the time she called he was apparently asleep, or in a drowse. Even later in the week, after he had grown much worse and nearer to the time of his death, he recognized his nephew, Samuel Prescott, who called to see him, and said: "Hello Sam, what are you doing here?" He also remembered the number of his room, which had been told him by the nurse soon after entering the hospital. Furthermore, he made a logical "statement" or "document" which, could it be sustained as a will, makes an intelligent disposition of his large estate, and that fact alone is strong evidence of testamentary capacity: Aggas v. Munnell et al., 302 Pa. 78; Snyder's Estate, 279 Pa. 63.

Several witnesses, citizens of good standing, including Henry Fish, a leader of the bar, and Mr. Alex Jarecki, a well-known manufacturer and business man, all close personal friends and associates of Mr. Prescott for many years and up to the time of his death, testified to his business ability and testamentary capacity up to a few days preceding his death. Both Dr. Hess and the nurse, Miss Kraschneske, who are also the subscribing witnesses, testified that decedent had testamentary capacity at the very time the writing was made, and Dr. Kemble, the other attending physician, testified to the same effect, when he last saw the decedent, only an hour or two before. Such testimony is of great importance, and strong evidence is required to impair its effect: Leisey's Estate, 280 Pa. 533; Phillips's Estate, 299 Pa. 415; Kane's Estate, 206 Pa. 204. It was also shown

that Mr. Prescott had previously expressed an intention of making bequests to Hamot and St. Vincent's Hospitals and to the Erie Boys' Club, which are the principal beneficiaries under the writing in question.

We were favorably impressed with the sincerity and ability of the expert witness, Dr. Arthur L. Chute, produced by the contestants, but after giving it as his opinion that Mr. Prescott did not have testamentary capacity at the time the alleged will was made, he admitted on cross-examination that in a very similar case he had advised a patient of his to make, and that he did make, a valid will. Speaking of the testimony of experts, Mr. Justice Simpson said in Snyder's Estate, 279 Pa. 63, 75: "This character of testimony 'is weak of its kind, and its kind is the very lowest that is ever allowed in a court of justice. . . .'" It is of very little weight under the facts in the instant case. The testimony of the other witnesses tending to show lack of testamentary capacity is also very weak and has little foundation of fact to rest upon. Opinions of witnesses, lay or expert, are of little value when confronted by actual facts: Guarantee Trust & Safe Deposit Company, Guardian, v. Heidenreich et al., 290 Pa. 249.

We have been able to find no evidence in the case justifying a finding of undue influence exercised over the testator, either by Dr. Hess or by any other person. He did nothing that a good friend or physician might not very properly do. The only influence used by him that seems to have been effective, other than the suggestion of the appointment of executors, already referred to, was in preventing a bequest of $100,000 to himself and a like bequest to Dr. Kemble, and in not permitting the naming of himself as executor of the estate. Manifestly, the doing of these things was not an injury to the estate, and we do not understand that the allegation of undue influence is based upon these facts.

In justice to the executors, Frank Wallace and Second National Bank of Erie, I think we should say that neither of them had anything to do with the preparation or attempted execution of the alleged will. Mr. Wallace has been president of the Second National Bank for many years, and is well and favorably known locally, as well as among bankers throughout the State. The Second National Bank is an institution with a long and creditable history. Its financial stability was never questioned before the so-called "bank holiday" was proclaimed by President Roosevelt, since which time it has been operated under a conservator.

A careful consideration of all the testimony leads to the conclusion that neither lack of testamentary capacity nor undue influence has been sufficiently shown to justify either setting aside the probate or the awarding of an issue.

The case was well tried and ably argued by the attorneys for both the proponents and the contestants. If error was made it was because of a misunderstanding of the facts, or in the application of the principles of law to the facts in the case, for which error, if any there be, we assume full responsibility.

This was not intended to be a treatise on the Wills Act, but the many unusual circumstances in the case and the different ways of attempted execution of the writing now before us has made necessary an already too extended discussion of the questions here involved.

In conclusion, we regret that distribution of this estate may not be made as provided in the writing probated, as that would be an admirable disposition of this large estate. The bequest of one third of the estate to Hamot and St. Vincent's Hospitals, and $200,000 to the Erie Boys' Club is commendable. The bequest to Mr. Warner and Mr. Vollmer seem well merited. The balance of the estate in trust for the sisters while they live would be more than ample for any possible needs they might have; the principal at their death to revert to the said hospitals as an endowment, would be a beneficence to the people of the

community in which the testator lived the greater part of his life and accumulated this large fortune. Such a disposition would have been a perpetual monument to decedent's memory. Although there was neither a legal nor a moral obligation resting upon him so to dispose of his estate, yet it does seem that a man, especially one having no family or children, or other immediate objects of his bounty, does owe some duty to the community in which he has spent the greater part of a long life and grown rich. May we express the hope that the sisters, who will now, in any event, receive the whole of this great fortune, will see the matter in this light and by endowing some of the many worthy charities in this city, erect a perpetual memorial to their deceseased brother in this community where he lived so many years, which he failed to do until it was too late.

The third reason set forth in the appeal is sustained, and the probate is vacated and set aside. The other reasons are not sustained. The alleged will of August 17, 1927, may be offered for probate. Its admission or refusal for probate is first to be determined by the register of wills.

Frank Wallace and the Second National Bank, acting executors, are required, if they have not already done so, to file an account showing all receipts and disbursements to the date of the filing of this opinion, together with a complete list or statement of all moneys, securities, and properties remaining in their hands, which shall be delivered to their successors in the administration of the estate, when duly qualified to receive the same. Distribution will be made as required by law, upon the audit of a final account.

From Otto Herbst, Erie, Penna.